**Terrence L. McGRANE, Plaintiff,**

v.

**The READER'S DIGEST ASSOCIATION, INC., Defendant.**

**No. 92 Civ. 8132 (VLB).**

United States District Court, S.D. New York.

May 27, 1993.

---

Robert L. Brinton, Brinton & January, White Plains, NY, for plaintiff.

Robert E. Crotty, Kelley, Drye & Warren, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

Plaintiff Terrence L. McGrane ("McGrane"), a former employee of defendant Reader's Digest Association, Inc. (the "Digest") brings this suit based on diversity of citizenship pursuant to 28 U.S.C. § 1332 seeking damages and other relief against the Digest. McGrane, hired as a fraud investigator for the Digest, claims that he was pre-

vented from pursuing various reports of financial wrongdoing in ways he thought were appropriate and that he was then fired for continuing to raise these issues. Based on this overall accusation against the Digest, plaintiff alleges contractual and related claims based on the denial to him of the opportunity to perform assigned duties and on his termination. Plaintiff also asserts violation of New York's "whistle blower" statute, N.Y. Labor Law § 740.

I deny the Digest's motion to dismiss McGrane's complaint, subject to renewal of the motion or the filing of a motion for summary judgment after 45 days, during which McGrane may supplement the complaint by submitting information outlined below.

### II

Over recent decades, public interest has increased in assuring protection for persons with inside information concerning wrongdoing where a coverup is involved within organizational entities, so that such information can reach proper authorities. This public concern is implemented by several legal provisions and doctrines.

At the federal level, administrative relief is available through the Merit Systems Protection Board. See 5 U.S.C. §§ 1206, 2301–02, 7511–12, 7701, discussed in 1978 U.S.Code Cong. & Admin. News 2723, and implemented by 5 CFR 315, 752.[1]

New York's "whistle blower" statute (N.Y. Labor Law § 740) provides for judicial enforcement and covers only reporting relating to health and safety; it provides for reinstatement and similar equitable relief but precludes suits for tort-like damages. See Scaduto v. Restaurant Associates, 180 A.D.2d 458, 579 N.Y.S.2d 381 (1st Dept.1992).

In the state and local public sector, the First and Fourteenth Amendments protect the opportunity for public employees to

---

1. There are limitations which apply when the Merit Systems Protection Board is part of the institutional structure against which the "whistle blower" is complaining. For contrast, see 29 U.S.C. § 153(d) (National Labor Relations Board); compare *FTC v. Elders Grain*, 868 F.2d 901, 905 (7th Cir.1989); Committee on Trade Regulation, "Federal Trade Commission Procedure for Issuance of Complaints," 30 Rec. Ass'n Bar City N.Y. 213 (1975); Report of the American Bar Ass'n Commission to Study the Federal Trade Commission 81–83 (1969).

raise matters of public interest (as opposed to individual employment disputes) publicly without adverse job consequences. See *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Courts are increasingly reluctant to enforce secrecy arrangements where matters of substantial concern to the public—as distinct from trade secrets or other legitimately confidential information—may be involved. See generally *Seattle Times v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *Meyer Goldberg, Inc. v. Fisher Foods,* 823 F.2d 159 (6th Cir.1987); *In re Reporters Committee,* 773 F.2d 1325 (D.C.Cir.1985) (dealing with judicial protective orders); see also "Commanche Peak and Rancho Seco Nuclear Power Plants," Hearing before the Subcommittee on Nuclear Regulation, Senate Environment and Public Works Comm., 101st Cong., 1st Sess. (May 4, 1989); Fifty-Ninth Report by the House Committee on Government Operations, H.Rep. 991, 100th Cong., 2d Sess. (1988).

Again at the federal level, where criminal wrongdoing and at times other misconduct are involved, arrangements to "cover up" may violate 18 U.S.C. § 3 (accessory after the fact), § 4 (misprision of felony), § 371 (conspiracy to defraud the United States), §§ 1341–1346 (mail and other fraud), §§ 1501–1517 (obstruction of justice) or other specific statutes including the Internal Revenue Code.[2]

Under various specific sources of law in the employment field but not involved here, retaliation for filing complaints is prohibited.

These legal concepts taken together suggest that one or more sources of law are likely to protect members of an organization bringing wrongdoing to the attention of proper authorities where an otherwise successful coverup is occurring. They also indicate that reporting of substantial health or safety risks can be protected even though internal remedies are useless.

These concepts do not suggest, however, that an employee may claim monetary damages because reporting internal to an organization is not to the levels, or on a timetable, which the employee may have been led to expect or to consider appropriate. Nor are financial improprieties placed on the same plane as threats to public health or safety. For better or worse, in most large corporate entities financial structures and their associated accounting, reporting and recordkeeping aspects are highly complex. Almost any disaffected member of a substantial corporate or institutional entity may find, in such entities, conditions or activities to complain about. This is a diversity case, and New York law applies. To avoid the cumulative effect of a potential flood of lawsuits seeking to convert ordinary employment disputes into "whistle-blower" protection cases, New York Labor Law § 740 (*supra,* p. 1045) is expressly limited to health and safety matters and permits solely equitable relief, not suits for tort damages.

Institutional entities are inherently vulnerable to allegations of abuses of authority within them, and to abusive claims of wrongdoing. They depend upon and must be regulated by legal standards, and they require protection from abuse of those standards. Thus in a case such as this, where allegations of corporate misconduct on a massive scale are asserted, courts must seek to penetrate beyond conclusory characterizations, and must require submission of additional detail where vagueness shrouds critical questions essential to a claim or defense.

## III

■ The complaint in this case weighs approximately five (5) pounds and constitutes, with exhibits, hundreds of pages. It fails to set forth facts pinpointing any ongoing fraud or hazard to health or safety which has not been remedied by the Digest. It mentions no reporting to external authorities on the part of plaintiff McGrane and, *a fortiori,* no retaliation as a result of such reporting.

The complaint likewise fails to identify any specific contractual agreement, either oral or in writing, which was violated.

The complaint does contain vague references to violations of various laws, and to an

---

2. Client disclosures of intention to commit future crimes or torts are within an exception to the attorney-client privilege, and *in camera* examination of documents may be utilized to determine whether this exception applies. *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).

unspecified problem involving candy. The sole actual financial fraud alleged in the complaint relates to an incident in Italy which led to dismissal of the alleged wrongdoers long before this lawsuit was filed. In describing what is no more than allegedly unfair, counterproductive or unethical behavior, the complaint as now drafted is deficient as a vehicle for pursuing a lawsuit under the Federal Rules of Civil Procedure. For contrast, see *Volvo North America Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55 (2d Cir.1988); see generally *Beaulieu v. United States*, 865 F.2d 1351 (1st Cir.1989); Marcus, "The Revival of Fact Pleading Under the Federal Rules of Civil Procedure," 86 Colum.L.Rev. 433 (1986).

Such merit as McGrane's complaint may or may not have is obscured by a plethora of colorful and imprecise language, conclusory characterizations, and unfavorable adjectives to describe the behavior of various officers and employees of the defendant.[3] Expressions of outrage do not replace the need, in federal pleading under Fed.R.Civ.P. 8, to state a claim upon which relief can be granted.

This is not a case in which the critical facts are known only to the adversary, justifying a pleading based largely on information and belief, drawing upon at times relatively thin inferences from those facts already known. See *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir.1988); *MacKnight v. Leonard Morse Hospital*, 828 F.2d 48, 52 (1st Cir.1987); *Cecere v. County of Westchester*, 814 F.Supp. 378 (S.D.N.Y.1993).

### IV

The Digest has moved to dismiss McGrane's complaint. While the deficiencies

in the complaint might well justify dismissal, I am not prepared to dismiss the complaint with prejudice at this stage. Contrariwise, dismissal with leave to file a restated amended complaint might merely add to delay and expense without shedding extensive light on whether McGrane's underlying claims do or do not have potential merit.

The objectives of the Federal Rules impel me to seek another alternative for clarifying the question as to whether this lawsuit should be permitted to proceed beyond the complaint stage, and if so on what terms. See Fed.R.Civ.P. 1, sentence 2; Judicial Improvements Act of 1990, Pub.Law 101–650, 104 Stat. 5089, enacting 28 U.S.C. § 473.

I accordingly have denied the Digest's motion to dismiss without prejudice to renewal or filing of a motion for summary judgment after a period of 45 days. During that period McGrane may submit, subject to the strictures of Fed.R.Civ.P. 11, the factual information described below to supplement the allegations contained in the complaint in order to assist me in determining whether any of McGrane's claims may properly survive under Fed.R.Civ.P. 12(b)(6) or 56. Any submissions McGrane chooses to make pursuant to this leave will constitute additions to the complaint pursuant to Fed.R.Civ.P. 15(a), sentence 2. Whether or not sworn to, such submissions will only convert any subsequent motion to dismiss into a motion for summary judgment pursuant to Fed.R.Civ.P. 12(b) if the moving party likewise submits affidavits.[4]

### V

McGrane points to no written agreement between himself and the Digest specifically or clearly insulating him from dismissal at

---

3. As an example of use of harsh language unconnected to a potentially valid legal claim, a conspiracy is claimed in extensive portions of McGrane's complaint. Only one party is, however, named as a defendant. Further, no attempt is made anywhere in plaintiff's papers to deal with the question of when if ever a civil conspiracy is recognized under New York law, an issue I need not now reach.

4. McGrane has submitted affidavits in opposition to the Digest's current motion to dismiss. The moving party—the Digest—has not done so. Un-

der Fed.R.Civ.P. 12(b), if affidavits or other material outside the scope of a complaint are considered in determining a motion to dismiss, the motion is converted into one for summary judgment under Fed.R.Civ.P. 56. I treat the affidavits submitted by and on behalf of McGrane as argument concerning the meaning of the complaint as though they had been memoranda of law; I decline to consider them as affidavits in connection with the present motion. Accordingly, I do not convert the present Rule 12 motion into a Rule 56 motion.

will, ordinarily otherwise permitted by New York law. See *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987); *Murphy v. American Home Products,* 58 N.Y.2d 293, 301, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983).

McGrane pinpoints no oral promise which is quoted verbatim. He refers to no specific statements described in detail which might constitute a contract made by a specific person at a specific time and place or in the presence of other specified persons.

Printed or otherwise reproduced documents distributed by an employer to employees are likely to have been carefully prepared and the circumstances may indicate that they are or would be likely to be relied upon by employees in seeking or continuing employment. See generally *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982); *Pincus v. Pabst Brewing Co.,* 893 F.2d 1544, 1549 (7th Cir.1990). Here, however, no written material distributed to McGrane appears to grant tenure.[5]

Absent written or oral agreements or corporate documentation expected to be relied upon, New York law precludes inferring a tenure which would freeze job property rights for particular employees once hired.[6] My conclusion in this respect is in accord with a decision involving similar claims against the Digest in this court in *O'Connor v. Readers Digest,* 92 Civ. 7414 (S.D.N.Y. March 10, 1993) (Brieant, C.J.).

## VI

McGrane contends that a contract can be implied permitting him to perform duties as a Certified Internal Auditor and Certified Fraud Examiner, and as Chief Internal Auditor for the Digest. In support of this claim, McGrane's complaint cites various Digest documents describing the functions of such auditors as McGrane, and setting forth professional standards drawn from external sources. Citing *Wieder v. Skala,* 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992), McGrane asserts that these professional standards constitute the core of a binding contractual relationship between McGrane and the Digest implied by law. McGrane seeks to show violation of these standards through the device of a lengthy narrative describing extensive internal bureaucratic warfare—a narrative liberally peppered with negative characterizations and adjectives.

The New York Court of Appeals in *Wieder v. Skala* held that a New York law firm could not dismiss an associate for reporting or threatening to report a violation of the Code of Professional Responsibility, treating that Code as a core part of the professional relationship created within a law firm. In reaching this conclusion, the Court relied on DR 1–103, requiring a lawyer possessing knowledge of such an ethical violation to report such knowledge to a proper tribunal, subject to exceptions not relevant here.[7]

The Code of Professional Responsibility was not a privately issued set of standards or rules, but rather was adopted by the respective Appellate Divisions of the New York Supreme Court on September 1, 1990 with amendments. McKinney's New York Judiciary Law, book 29 at 350 (1992). The judiciary, consisting of lawyers in fact though not by constitutional requirement, is also the chief guardian looked to by the public to seek to uphold the ethics of its own profession.

---

5. McGrane's contention that Digest documents promised him that he could perform his duties in a particular manner and be able to report to certain levels in the organization are discussed later in this memorandum order.

6. See Rottenberg, "Property in Work," 15 Industrial & Labor Rel.Rev. 402 (1962). An effect of such freezing might be to deny job opportunities to others or to discourage employers from expanding their permanent workforce. See *Legal Strategies for Industrial Innovation* ch 2 (Shepard's/McGraw–Hill 1982).

7. Problems are presented by this "honor code." There is a risk that borderline suspicions of misconduct will lead to erroneous reports to avoid discipline for not reporting; this has led to judicial caution in finding violations of the reporting requirement. See *In re Grievance Committee,* 847 F.2d 57 (2d Cir.1988).

The reporting requirement, if broadly construed, might encourage reports based on vague suspicion which are designed to create additional difficulties for an adversary. See generally Rotunda, "The Lawyer's Duty to Report Another Lawyer's Unethical Violations in the Wake of *In re Himmel,* " 1988 U.Ill.L.Rev. No. 4 at 977; Mitchem, "The Lawyer's Duty to Report Ethical Violations," 18 Colo.Law. No. 10 at 1915 (Oct. 1989).

See generally Stone, "The Public Influence of the Bar," 48 Harv.L.Rev. 1 (1934).[8]

None of these factors which support an implication that a private employment contract incorporates certain external ethical standards applies to industry-developed standards for accountants. As privately promulgated guidelines, these are not inherently binding on the citizenry.[9] Delegation of powers of sovereign compulsion to private entities—no state or federal law has this effect in the matter before me—might well be constitutionally suspect.[10]

In exercising diversity jurisdiction, I am directed to attempt to predict what the state's highest court would be likely to do if confronted with a similar question.[11] In doing so, I look to relevant statutes and other documents,[12] applicable decisions such as *Wieder* itself, and the purposes of state statutory and judicial decisions which can be inferred from their nature and background.[13] The Court in *Wieder* goes to substantial lengths to confine its reach primarily and possibly exclusively to cases involving legal ethics. Extending it beyond that terrain could effectively outflank *Murphy, Sabetay, supra,* and similar New York cases.[14]

Even if *Wieder* is to be extended beyond cases involving disregard of legal ethics, the present complaint furnishes no grounds for doing so.

*Wieder,* of course, involved judicial imputation of terms to a contract not explicitly or perhaps intentionally agreed to by the parties, leading to remedies they quite possibly did not contemplate and might have rejected. The courts utilize this means for imposing obligations inherent in basic background principles of our legal system—e.g., that

8. The mere fact that a concept carries the label of "legal ethics" does not necessarily make it part of the core referred to in *Wieder.* Presumably the special judicial concern with enforcement of legal ethics implemented in that case was focused primarily on those canons designed either to safeguard the public or to protect the integrity and efficiency of the judicial process. Thus those legal ethics standards deemed to be incorporated into contracts without consensual agreement would not include those canons which had the primary purpose or effect of protecting the exclusivity or economic welfare of the legal profession. See *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (fee level recommendations by organized bar); *Bates v. Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (restriction on advertising).

9. Private standards enforced by public authority without independent scrutiny are sometimes known as "hybrid restraints," *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 345–46 n. 8, 107 S.Ct. 720, 726 n. 8, 93 L.Ed.2d 667 (1987) (Powell, J.) (found subject to antitrust scrutiny where anticompetitive impact may exist); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

For further discussions of risks involved where the public sector or its equivalent is implicated in imposing what are, in effect, contractual requirements upon non-consenting private parties, see generally *Indian Head, Inc. v. Allied Tube & Conduit Corp.,* 817 F.2d 938 (2d Cir.1987), *aff'd* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332 (9th Cir.1990); *Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1341 (7th Cir.1987); Fallows, "The Case Against Credentialism," 256 Atlantic 49 (Dec.1985); see also

*Hoover v. Ronwin,* 466 U.S. 558, 582–601, 104 S.Ct. 1989, 2002–2012, 80 L.Ed.2d 590 (1984) (dissenting opinion, describing impact of medieval guilds; holding of case not relevant here).

10. *Yakus v. United States,* 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944) (Stone, C.J.); see Note, 67 Harv.L.Rev. 1398 (1954).

11. For foundation cases, see *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

12. See Stone, "The Common Law in the United States," 50 Harv.L.Rev. 4 (1936).

13. See *Genesco Entertainment v. Koch,* 593 F.Supp. 743 (S.D.N.Y.1984) (Weinfeld, J.), construing N.Y.Gen.Bus. Law § 349–350; see generally concerning criteria for interpreting documents, *United States v. Classic,* 313 U.S. 299, 317–18, 61 S.Ct. 1031, 1038–39, 85 L.Ed. 1368 (1941) (Stone, C.J.).

14. Unlike appellate courts, trial courts have not yet been authorized to certify questions of state law to state courts. See *Lehman Bros. v. Schein,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974); Committee on Federal Courts, "Analysis of State Laws Providing for Certification by Federal Courts of Determinative Issues of State Law," 42 Rec.Ass'n of the Bar of the City of New York 101 (Jan.1987).

It is not clear at this juncture that my interpretation of *Wieder* is independently determinative. Violations of accounting ethics are only conclusorily alleged in the complaint.

power implies responsibility, and that intervention is on occasion necessary to avoid abuse of that power. A leading example is the duty of fair representation on the part of labor organizations granted exclusive bargaining authority by statute (29 U.S.C. § 159), originally recognized in the landmark decision of *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).[15] No duty to innocent third parties is implicated in the present case which might justify *Steele*-like or *Wieder* interpolation of nonconsensual provisions into contracts.

The "whistle blower" statute (N.Y.Labor Law § 740), relevant by analogy,[16] has not been interpreted as incorporating professional standards as grounds for permitting lawsuits not otherwise authorized by the statute. See *Easterson v. Long Island Jewish Medical Center*, 156 A.D.2d 636, 549 N.Y.S.2d 135 (2d Dept.1989), *leave to appeal denied* 76 N.Y.2d 704, 559 N.Y.S.2d 983, 559 N.E.2d 677 (1990) (involving Education Law § 6509(9), 8 NYCRR 29.1(b)(8) relating to confidentiality of medical records).

Custom, industry practice and professional standards may be relevant for many purposes, including interpretation of otherwise vague documents. See *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir.1979). Interpolation of such matters into a contract when pursuant to and not contrary to the inferable objective of the document, is often "necessary and proper"[17] to permit it to function. See Llewellyn, "Meet Negotiable Instruments," 44 Colum.L.Rev. 298, 322 (1944) (attempt to spell out all aspects of implementation of a document in advance will end with multi-volume encyclopedia of law and procedure "or else with plain exhaustion"). Otherwise, endless detail and sub-detail would become necessary in every document. See Manning, "Hyper-

lexis and the Law of Conservation of Ambiguity," 36 Tax Law. No. 1 at 9 (Fall 1982). Broad contractual language relating to the subject matter at issue might justify use of industry practice, perhaps evidenced by private professional pronouncements if applicable, to fill any gaps in the contract at issue. See Farnsworth, "Disputes Over Omissions in Contracts," 68 Colum.L.Rev. 860 (1968).

The fact that a document describing professional standards is distributed by a party does not, however, itself create a contractual commitment to follow those standards. To hold to the contrary would have a chilling effect on dissemination of information where no contractual intent can be inferred, and would run contrary to the "sanctity of contractual arrangements," *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (en banc), *cert. denied* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Predictability vital to commercial usefulness of the contracting process would suffer without counterbalancing benefits. See Jones, "The Jurisprudence of Contracts," 44 U.Cinc.L.Rev. 43 (1975).

## VII

McGrane complains that the Digest would not permit him to make reports to everyone to whom he wished to report, or to fulfill all of the functions contained in internal and professional guidelines concerning the duties of his position. Descriptions of duties do not ordinarily constitute enforceable promises to employees that they are legally entitled to perform all functions described. See *Watkins v. McConologue*, 1992 WL 131044 (S.D.N.Y.1992), *aff'd* 978 F.2d 706 (2d Cir. 1992).

An employer may ordinarily relieve an employee of duties without causing cognizable injury to the employee, so long as the employee is paid.[18] Were the contrary the law,

---

**15.** See *Chauffeurs, Teamsters & Helpers Local 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (treating duty as contractual in nature in some circumstances despite absence of consent).

**16.** See *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 569, 190 N.Y.S.2d 977, 987, 161 N.E.2d 197, 204 (1959); *Schuster v. City of New York*, 5 N.Y.2d 75, 85–86, 180 N.Y.S.2d 265, 273–74, 154 N.E.2d 534, 540 (1958); Stone, "The

Common Law in the United States," 50 Harv. L.Rev. 4 (1936).

**17.** Article I § 8, clause 18 contains this language to clarify the authority of Congress to implement its other powers.

**18.** Even in the public sector where adverse action flows from impermissible considerations, "... where the employer perceives a significant hazard in keeping the employee on the job, it can

internal bureaucratic arrangements would become frozen into fiefdoms protected by proprietary rights to turf[19] with obvious counterproductive consequences for the employer, and for the economy. It might indirectly have deleterious consequences for the viability of the enterprise itself, and its capacity to continue to make employment available.

Even were the law favorable to McGrane on this issue, the factual basis alleged for its application is inadequate: the only actual fraud set forth in any detail in the complaint relates to a matter arising in Italy where the perpetrators were dismissed during McGrane's tenure. Another incident relates to alleged conflicts of interest on the part of Digest employees having asserted connections with other companies, matters which the Digest could waive at its discretion and which are hardly of public interest. No coverup can be claimed in either situation.

### VIII

McGrane's reliance on New York's "whistle blower" statute, N.Y.Labor Law § 740, must fail unless he can show that he reported or wished to report a substantial and specific danger to public health or safety. Financial improprieties within a corporation do not constitute threats to public health or safety under Labor Law § 740. See *Remba v. Federation Employment & Guidance Service*, 76 N.Y.2d 801, 559 N.Y.S.2d 961, 559 N.E.2d 655 (1990).

McGrane hints that information he possesses and that was somehow suppressed suggests risks involving food products arising from improper behavior on the part of the Digest. McGrane may supplement his pleadings with specific factual allegations (not le-

gal conclusions) in this regard within the next 45 days.

McGrane may also wish to set forth in detail whether or not he reached, or attempted to reach, supervisors or outside authorities concerning any hazardous behavior he contends he had discovered at the Digest. If he did not do so, he may wish to set forth in detail what forms of restraint, if any, he alleges the Digest employed to prevent him from doing so. Such information should consist of documents or descriptions of what was said during specific conversations, including who participated, when and where. Such information might also shed light on whether or not there was an arrangement, agreement or condition which required McGrane to leave the Digest quietly without revealing to others facts known to him, and whether there are circumstances indicating the illegality of such arrangement, agreement or condition.[20]

### IX

McGrane argues that the Digest coerced him to leave quietly, and he infers that he was deterred from reporting to proper authorities unspecified information suggesting ongoing wrongdoing within the Digest which had been covered up; he appears to indicate, without setting forth details, that he was forced to enter into a commitment to withhold from proper authorities information with respect to illegal activities within the Digest.

Any arrangement or agreement, formal or informal, designed to preclude a former employee from reporting wrongdoing by a former employer to proper authorities would be unenforceable by virtue of 18 U.S.C. §§ 3, 4,

---

avoid the problem by suspending with pay." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 544–45, 105 S.Ct. 1487, 1494–95, 84 L.Ed.2d 494 (1985). "[S]uspension with pay does not raise due process concerns," *Hicks v. City of Watonga*, 942 F.2d 737, 746 n. 4 (10th Cir.1991); see *Weg v. Macchiarola*, 729 F.Supp. 328, 338 (S.D.N.Y.1990).

19. See C.N. Parkinson, *Parkinson's Law* (1957); D. Weinstein, *Bureaucratic Opposition* (1978); J. Jacobs, *The Economy of Cities* (1969); Old, *On the Mathematics of Committees, Boards and Panels*, 16 Record of The Ass'n of the Bar of the City of New York 101 (1961).

20. Absent applicability of New York Labor Law § 740, illegality of agreements not to reveal facts might depend on whether a criminal obstruction of justice or misprision of felony was or might be involved (18 U.S.C. §§ 4, 1503–1512), or whether some other statute was violated. See *Duplan Corp. v. Deering Milliken*, 444 F.Supp. 648 (D.S.C.1977), aff'd in part, rev'd in part 594 F.2d 979 (4th Cir.1979), cert. denied 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980); L. Sullivan, *Antitrust* § 188 (1977).

and 1501–1517 as well as other statutory provisions, some of which are cited above, and because of the principles discussed in part II above, and their implications. Indeed, even judicially approved agreements calling for confidentiality may be modified where clearly called for by an overriding public interest. See generally *Seattle Times v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *Meyer Goldberg, Inc. v. Fisher Foods,* 823 F.2d 159 (6th Cir.1987); *In re Reporters Committee,* 773 F.2d 1325 (D.C.Cir.1985).[21]

Restrictions on discussion of the outcome of litigation do not carry the same risks as restraints on freedom of expression regarding underlying wrongdoing, if any. While such matters as monetary amounts of settlements, or even their very existence, may be of little or no genuine public interest, the courts can hardly be called upon to enforce an employer-employee exit agreement for the covering up of wrongdoing which might violate criminal laws. See generally *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

Disclosures of wrongdoing do not constitute revelations of trade secrets which can be prohibited by agreements binding on former employees. See generally *Winston Research Corp. v. Minnesota Mining & Mfg. Co.,* 350 F.2d 134, 137–38 (9th Cir.1965); *Integrated Cash Management v. Digital Transactions,* 920 F.2d 171, 173 (2d Cir.1990), quoting *Eagle Comtronics v. Pico,* 89 A.D.2d 803, 803–04, 453 N.Y.S.2d 470, 474 (4th Dep't 1982), also quoting Restatement of Torts § 757, comment b; *Licata & Co. v. Goldberg,* 812 F.Supp. 403 (S.D.N.Y.1993); Brown & Swanson, "Maintaining the Competitive Edge: Lawful Protection of Trade Secrets," 10 Employee Rel.L.J. 374 (Winter 1984–85).

I afford McGrane 45 days during which he may supplement the complaint by furnishing concrete, specific details concerning any reports concerning ongoing wrongdoing, if any, which he made or attempted to make, to whom, when, where and by what means and with what adverse consequences, if any.

### X

McGrane asserts that his severance package was not furnished in full, but attaches no written agreements containing provisions violated, no specific quotations or descriptions of oral commitments including who made them, when, where and in whose presence, no numerical calculations of underpayments, and no other specific information which would permit me even to consider claims based on this assertion. McGrane may furnish such information if it exists during the 45 day period described.

### XI

The Digest relies on a release signed by McGrane. McGrane asserts that his assent was coerced, alleging that he had the document only a matter of days. McGrane may furnish during the 45 day period any information available to him which would show actual coercion. He may indicate whether he consulted counsel or had the opportunity to do so.

SO ORDERED.

---

21. Former employees are ordinarily deemed outside the reach of the restriction that legal ethics imposes which bars counsel for an adversary of their former employer from approaching current employees directly—and this is so even if the former employees are represented by the employer's counsel. See generally *Dubois v. Gradco Systems,* 136 F.R.D. 341 (D.Conn.1991); *Action Air Freight v. Pilot Air Freight,* 769 F.Supp. 899 (E.D.Pa.1991); *Hanntz v. Shiley,* 766 F.Supp. 258 (D.N.J.1991); *Curley v. Cumberland Farms,* 134 F.R.D. 77 (D.N.J.1991); *Public Service Electric & Gas Co. v. Associated Electric,* 745 F.Supp. 1037 (D.N.J.1991); *Valassis v. Samelson,* 143 F.R.D. 118 (E.D.Mich.1992); *Shearson Lehman Bros. v. Wasatch Bank,* 139 F.R.D. 412 (D.Utah 1991); *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126 (D.D.C.1983); *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990).