**Leigh McCONCHIE, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

**No. 96–CV–1776.**

United States District Court,
N.D. New York.

Nov. 17, 1997.

Snyder, Kiley, Loren N. Brown, Toohey & Corbett, LLP (Loren N. Brown, of Counsel), Saratoga, Springs, NY, for Plaintiff.

Roberts & Finger, LLP (Joel L. Finger, Lisa E. Dayan, of Counsel), New York, New York, for Defendant.

## MEMORANDUM, DECISION AND ORDER

McAVOY, Chief Judge.

This diversity action presents the narrow issue of whether, under New York law, an employer's termination of a licensed pharmacist for disobeying a directive that the pharmacist believed to be unethical and illegal is actionable as a breach of contract based upon an implied-in-law obligation.

## I. BACKGROUND

### A. Facts

The facts in this case, for the most part, are undisputed, and because plaintiff failed to file a Rule 7.1(f) Statement, he is deemed to have admitted the material facts set forth in defendant's statement. *See* Local Rule 7.1(f).

Plaintiff Leigh McConchie, a New York resident, was hired by defendant Wal–Mart Stores, Inc., a Delaware corporation with a principal place of business in Arkansas,[1] on June 11, 1993 as a pharmacist in defendant's Greenbush, New York store. He was later transferred to the Wilton/Saratoga Springs store, where he worked until he was terminated. Pl. Dep. at 37, 61, 66–67. At all relevant times, plaintiff was licensed to practice as a pharmacist in New York State. Plaintiff had no employment contract with defendant at any time, and concedes that he could be terminated at will. *Id.* at 70, 105–06; Pl. Aff. ¶ 3.

During the relevant period of plaintiff's employment, he reported to District Manager Susan Stafford. Pl. Dep. at 115. Stafford also is a pharmacist licensed to practice in New York. Stafford in turn reported to Randy Sims, defendant's Regional Manager, who is a licensed pharmacist, but is not licensed to practice in New York. Sims reported to Vice–President Robert Cummings. *Id.* at 115–16.

Defendant has set prices for its prescriptions, which are listed on its computer system. Plaintiff, like all of defendant's pharmacists, had discretion to override these set prices. Pl. Dep. at 122–24. Such discretion might be exercised when, for example, a customer informs the pharmacist that a competitor carries the same product at a lower price. *Id.* at 123–24. Moreover, for bulk or

---

**1.** The Court's jurisdiction is founded upon the diversity of citizenship of the parties. *See* 28 U.S.C. § 1332.

high volume purchases, the computer system automatically provides a discount, so that the more a customer purchases, the lower the per unit cost. *Id.* at 123.

At issue in the present case are prescriptions plaintiff filled for a veterinarian, Dr. James Prendergast, for various types of horse medication. Pl. Dep. at 117–22. Whenever Prendergast bought medication in bulk, which he apparently did very often, he received the volume discount. In February of 1996, when reviewing financial reports with Sims, Stafford noted a decrease in the "gross profit percent" for the Wilton/Saratoga Springs store. Stafford Dep. at 7–9; Sims Dep. at 18–19.[2] In speaking with plaintiff about the decrease in the gross profit percent for his store, plaintiff told Stafford that he was filling a number of large volume prescriptions for Prendergast. Pl. Dep. at 133–35; Stafford Aff. ¶ 8.

Stafford discussed the matter with Sims and told him that she felt it was illegal for defendant to sell large quantities of drugs to one individual, as opposed to filling prescriptions for the amount of medication that only one patient (or animal) would take. Stafford Aff. ¶ 12; Sims Aff. ¶ 6. After checking with Cummings, Sims told Stafford that defendant was not a wholesaler or distributor and plaintiff could no longer fill prescriptions for larger quantities of drugs to one individual at discount prices. Stafford Aff. ¶ 13; Sims Aff. ¶ 7.

Shortly thereafter, Stafford expressed her concerns to plaintiff about filling prescriptions for large quantities of drugs. First, she noted that such prescriptions lowered the gross profit percent. Pl. Dep. at 133–38. Second, she told plaintiff that defendant was not registered as a wholesaler, and yet was filling prescriptions for large quantities made out to Prendergast rather than the ultimate user of the drug. *Id.* at 139–43; Stafford Dep. at 16–17. Plaintiff told Stafford that he believed that Prendergast was using the medication for several animals in his practice, but that he was not reselling the drugs for profit. *Id.* at 169.

On March 2, 1996, Sims himself contacted plaintiff. As plaintiff describes it, Sims told plaintiff that he was " 'no longer to fill prescriptions that have been or are to be written by Dr. Prendergast.' " Pl. Dep. at 143. Sims gave plaintiff two reasons for this imperative: (1) he felt that filling large dollar volume prescriptions was affecting the profit margin of the pharmacy; and (2) because plaintiff was filling large volume prescriptions in one person's name, it made it appear as if defendant was wholesaling medication. *Id.* at 143–44. Though plaintiff protested that he could simply speak to Prendergast and get the individual patient names for each prescription, Sims persisted, telling plaintiff that the prescriptions were being filled at a low profit margin, and that plaintiff was to stop filling them. *Id.* at 146. Plaintiff understood Sims' order to mean that he could not fill any prescriptions for Prendergast. Plaintiff also alleges telling Sims that he believed it was against the law and pharmaceutical ethics to refuse to fill or refill a prescription based on profit margin, though he could not specify what legal or ethical rule he had in mind. *Id.* at 152.

After his talk with Sims, plaintiff called Stafford and told her about the conversation. Pl. Dep. at 109–10. Stafford agreed with Sims, and told plaintiff that he would be "in trouble" if he failed to follow Sims' instructions. *Id.* at 111–14, 161.

Nonetheless, on March 8, plaintiff filled three prescriptions for Prendergrast. The prescriptions were for a horse named "Cigar" and were written by Prendergrast. On March 11 plaintiff filled two more prescriptions for "Cigar" written by Prendergast. The amount of medication in the March 8 and 11 prescriptions were for large volumes, for which Prendergast received the volume discount. Pl. Dep. at 167; Sims Dep. at 25–26; Stafford Aff. ¶ 17.

On March 13, 1996, plaintiff met with Stafford and store manager Kathy Davis. Stafford told plaintiff that he was being terminat-

---

**2.** Gross profit percent is the percent difference between the cost of a drug and its retail price.

Pl. Dep. at 128–29.

ed for insubordination regarding the March 8 and 11 prescriptions.

## B. Procedural History

Plaintiff filed this lawsuit in New York State Supreme Court, Saratoga County on October 4, 1996. On November 8, 1996, defendant removed the action to this Court. Plaintiff's Second Amended Complaint ("Complaint") contains only one claim: wrongful discharge. Defendant now moves for summary judgment and plaintiff cross-moves for the same relief.

## II. Discussion

### A. Defendant's Motion for Summary Judgment

#### 1. Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party, *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317 (2d Cir.1975), and the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 585–86, 106 S.Ct. at 1355–56. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991)(quoting *Matsushita,* 475 U.S. at 586, ·106 S.Ct. at 1356).

It is with these considerations in mind that the Court addresses defendant's motion for summary judgment.

#### 2. At–Will Employment Under New York Law

The parties agree that New York law applies. The general rule in New York is that employment is "at will," meaning the employment relationship is terminable at any time by either party. *Wright v. Cayan,* 817 F.2d 999, 1002 (2d Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920–21 (1987); *Murphy v. American Home Products,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983). This rule, however, is only a rebuttable presumption, *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 198, 443 N.E.2d 441, 446 (1982), and can be "trumped" in two ways. First, " 'if the employer made a promise, either express or implied ... that the employment should continue for a period of time that is either definite or capable of being determined, that employment is not terminable by him at will.' " *Weiner,* 457 N.Y.S.2d at 197, 443 N.E.2d at 445 (quoting 1A Corbin, Contracts, § 152 at 14). Second, even if the employment contract is of an indefinite duration, courts will give effect to an *express* limitation on the employer's right to discharge. *Murphy,* 461 N.Y.S.2d at 237, 448 N.E.2d at 91.

Plaintiff appears to have abandoned both of these theories. He concedes that his employment was at-will, and presents no evidence that his employment was for a specific

term, or that he had any express agreement limiting defendant's right to discharge him. Nonetheless, relying on *Wieder v. Skala,* 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992), plaintiff argues that because refusing to fill Prendergast's prescriptions would violate the legal and ethical rules governing the pharmacy profession, his termination for disobeying Sims' directive constitutes a breach of an implied obligation and thus should be actionable.

In *Wieder,* the plaintiff was an attorney who, while employed by a law firm, came to learn of the professional misconduct of an associate, L.L., including neglect, false statements, and what L.L. himself termed " 'several acts of legal malpractice and fraud and deceit upon plaintiff and several other clients of the firm.' " *Id.* at 753, 609 N.E.2d at 106. After insisting to the firm that L.L.'s misconduct be reported to the Appellate Division Disciplinary Committee as required by DR 1–103(A)[3], the plaintiff ultimately was fired. He sued, claiming, *inter alia,* (1) that his discharge constituted a breach of the employment relationship; and (2) that his discharge violated public policy.

The Court of Appeals reversed the Appellate Division's dismissal of the first claim. In doing so, the court first examined its prior cases dealing with implied obligations in employment relationships. In *Murphy v. American Home Prods. Corp.,* for example, the plaintiff had been discharged in bad faith in retaliation for his disclosure of accounting improprieties. The court there "rejected the argument that plaintiff's discharge ... violated a legally implied obligation in the employment contract requiring the employer to deal fairly and in good faith with the employee[.]" *Wieder,* 593 N.Y.S.2d at 754, 609 N.E.2d at 107. Though such legally implied obligations are recognized where they "are in furtherance of other terms of the agreement of the parties," it would be "incongruous" to imply such an obligation in the at-will employment context, since it would be destructive of the employer's otherwise unfettered right of ter-

mination. *Murphy,* 461 N.Y.S.2d at 237, 448 N.E.2d at 91. In *Sabetay v. Sterling Drug, Inc.,* the court reaffirmed *Murphy*'s rejection of the implied obligation of good faith exception, holding that an employer who allegedly fired an employee for "whistle-blowing" and refusing to engage in unethical activities had no implied obligation to deal in good faith where such an obligation would be inconsistent with other mutually agreed upon terms in the contract. *Sabetay,* 514 N.Y.S.2d at 212, 506 N.E.2d at 921–22.

Acknowledging these holdings in *Wieder,* the Court of Appeals went on to distinguish the case before it. First, the court noted that in both *Murphy* and *Sabetay,* the plaintiffs worked in the financial departments of large companies. *Wieder,* 593 N.Y.S.2d at 755, 609 N.E.2d at 108. Thus, their accounting duties and responsibilities were in furtherance of their *primary* duties as corporate managers. *Id.* The rendering of professional services by an attorney, however, is "at the core" of his association with a firm. *Id.* Moreover, while attorneys may be employees, "they remain independent officers of the court responsible in a broader public sense for their professional obligations." *Id.* In light of these distinctions, the court expressly found an implied obligation unique to employment relationships among attorneys:

> We agree with the plaintiff that in any hiring of an attorney as an associate to practice law with a firm there is implied an understanding so fundamental to the relationship and essential to its purpose as to require no expression: that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession. Erecting or countenancing disincentives to compliance with the applicable rules of professional conduct ... would subvert the central professional purpose of his relationship with the firm—the lawful and ethical practice of law.

---

3. A lawyer possessing knowledge, not protected as a confidence or secret, of a violation of DR 1–103 that raises a substantial question as to another lawyer's honesty, trustworthiness or fitness in other respects as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.
DR 1–103(A).

*Id.* The court also emphasized the critical importance of the particular disciplinary rule in question—DR 1–103—to the self-regulation of the practice of law itself, indicating that " 'the reporting requirement is nothing less than essential to the survival of the profession.' " *Wieder,* 593 N.Y.S.2d at 756, 609 N.E.2d at 109 (quoting Gentile, *Professional Responsibility—Reporting Misconduct by Other Lawyers,* N.Y.L.J., Oct. 23, 1984, at 1, col. 1; at 2, col. 2.).

Ultimately, however, the court found that failing to recognize an implied obligation in *Wieder* would present the kind of incongruity in the contractual relationship that *Murphy* and *Sabetay* sought to avoid. Because the only objective of the relationship between the plaintiff and the law firm was to practice law, and because inherent in this relationship was the "essential compact" that both parties would do so in compliance with the governing ethical rules,

> [i]nsisting that ... plaintiff must act unethically and in violation of one of the primary professional rules amounted to nothing less than a frustration of the only legitimate purpose of the employment relationship.

*Wieder,* 593 N.Y.S.2d at 757, 609 N.E.2d at 110. Thus, the unique posture of the parties to the employment relationship in *Wieder* distinguished it from both *Murphy* and *Sabetay. Id.*

Finally, though the court found that plaintiff stated a breach of contract claim, it rejected his claim that his discharge violated public policy (a claim sounding in tort), finding that "significant alteration of employment relationships, such as the plaintiff urges, is best left to the legislature.' " (quoting *Sabetay,* 514 N.Y.S.2d at 213, 506 N.E.2d at 922–23.[4]

From this discussion of *Wieder,* it is clear that plaintiff's reliance on the case is misplaced. Though much of *Wieder* 's rationale theoretically applies to any employment relationship involving licensed professionals, the court took great pains to confine the implied obligation to the particular facts presented. The court noted, for example, that the implied obligation arose in the *"distinctive relationship* between a law firm and a lawyer hired as an associate." *Id.* at 755, 609 N.E.2d at 108 (emphasis added). The court went on to note that the disciplinary rule at issue[5] was "critical to the unique function of self-regulation *belonging to the legal profession," id.* (emphasis added), and that the *"unique characteristics of* the legal *profession* in respect to this core Disciplinary Rule make the relationship of an associate to a law firm employer *intrinsically different ...".* *Id.* at 756, 609 N.E.2d at 109 (emphasis added). Indeed, as one commentator has noted, the *Wieder* opinion "is so replete with language of limitation and qualification that it suggests the Court intended its holding to encompass only law firm associates who find themselves in *Wieder* 's precise circumstances." Sandra J. Mullings, *Wieder V. Skala: A Chink in the Armor of the At-will Doctrine or a Lance for Law Firm Associates?,* 45 Syracuse L. Rev. 963, 964 (1995); *see also Wolde–Meskel v. Tremont Commonwealth Council,* 1994 WL 167977 at *3 (S.D.N.Y.) (noting that *Wieder* was "carefully limited to the particular circumstances of legal employment"); *McGrane v. Reader's Digest Ass'n,* 822 F.Supp. 1044, 1049 (S.D.N.Y.1993) (noting that *Wieder* "goes to substantial lengths to confine its reach primarily and possibly exclusively to cases involving legal ethics.").

This conclusion further is supported by the reluctance of New York courts in subsequent decisions to broaden *Wieder* 's scope. In

---

4. Thus, to the extent plaintiff's Complaint sounds in tort, summary judgment clearly is warranted.

5. Not only does this language bespeak caution in extending the rule beyond the context of legal employment, the Court went so far as to confine its holding to the *particular rule* at issue: "we, by no means, suggest that each provision of the Code of Professional Responsibility should be deemed incorporated as an implied-in-law term

in every contractual relationship between or among lawyers." *Wieder,* 593 N.Y.S.2d at 756, 609 N.E.2d at 109; *see also Rojas v. Debevoise & Plimpton,* 167 Misc.2d 451, 634 N.Y.S.2d 358, 361 (Sup.Ct. N.Y. County 1995) (declining to extend *Wieder* 's holding to other rules in Code of Professional Responsibility not implicating "the core purpose of the employment, the practice of law.").

*Mulder v. Donaldson, Lufkin & Jenrette,* 208 A.D.2d 301, 623 N.Y.S.2d 560 (1st Dep't 1995), for example, the First Department explicitly rejected an interpretation of *Wieder* by a lower court that would extend the implied obligation exception to "any licensed business or profession whose continued practice is subject to compliance with laws or regulations governing the conduct of such business or profession." *Id.* 623 N.Y.S.2d at 563 (internal quotations omitted). In that case, the plaintiff was a brokerage house auditor who sued his employer, a brokerage house, after he was fired for reporting a money-laundering scheme at one of the employer's offices in Florida. *Id.* at 561–62. The court held that the plaintiff's situation was more akin to the facts presented in *Murphy* and *Sabetay,* the very same fact situations the *Wieder* court found distinguishable. *Id.* at 563.

Moreover, this Court is aware of no reported decision allowing a breach of employment contract claim to survive under the *Wieder* rationale in the context of any profession, legal or otherwise. On the contrary: such claims overwhelmingly have been rejected by New York's courts. *See. e.g., Leibowitz v. Party Experience, Inc.,* 233 A.D.2d 481, 650 N.Y.S.2d 286, 287 (2d Dep't 1996); *DeFilippo v. Xerox Corp.,* 223 A.D.2d 846, 636 N.Y.S.2d 463, 465 (3d Dep't), *leave to appeal dismissed,* 87 N.Y.2d 1056, 644 N.Y.S.2d 147, 666 N.E.2d 1061 (1996); *Haviland v. J. Aron & Co.,* 212 A.D.2d 439, 622 N.Y.S.2d 703, 704 (1st Dep't), *leave to appeal denied,* 85 N.Y.2d 810, 629 N.Y.S.2d 724, 653 N.E.2d 620 (1995); *Kelleher v. Corinthian Media, Inc.,* 208 A.D.2d 477, 617 N.Y.S.2d 726, 727 (1st Dep't 1994); *accord Luck v. Mazzone,* 52 F.3d 475, 477 (2d Cir.1995); *Fry v. McCall,* 945 F.Supp. 655, 667 (S.D.N.Y. 1996).

For these reasons, the Court finds *Wieder* inapplicable. Because plaintiff was an at-will employee, he could be fired for any reason or no reason at all. *See Tramontozzi v. St. Francis College,* 232 A.D.2d 629, 649 N.Y.S.2d 43, 44 (2d Dep't 1996). Thus, summary judgment must be granted.

Even if the Court were to venture into uncharted territory and hold that plaintiff stated a claim for breach of contract under *Wieder,* he has presented no evidence that would raise a genuine issue of material fact as to such a claim. First, plaintiff can point to no ethical or legal rule or policy that he would have violated by obeying Sims' order. None of the statement's in defendant's own internal policy upon which plaintiff relies, such as those requiring that Wal–Mart pharmacists are to "maintain high ethical standards" and "perform the legal and moral responsibility to the profession and to the general public" render Sims' mandate improper. And even if they did, plaintiff would raise no issue of fact: an employer's discharge of an employee in violation of the employer's own code of conduct is not actionable. *See Civiletti v. Independence Savings Bank,* 236 A.D.2d 436, 653 N.Y.S.2d 142 (2d Dep't 1997).

Moreover, the only legal or ethical rule plaintiff alleges, in hindsight, to have relied on in disobeying Sims' order is far too general to give rise to a *Wieder* claim. Rule 29.2 of the Rules of the New York State Board of Regents provides, in pertinent part, that unprofessional conduct in the field of pharmacy shall include "abandoning or neglecting a patient or client under and in need of immediate professional care, without making reasonable arrangements for the continuation of such care[.]" *Id.* Rule 29.2(a)(1). Plaintiff can point to no rule specifically covering the conduct in question, i.e., refusing to fill large volume prescriptions because of economic or licensing considerations. Such specificity was critical in *Wieder. See, e.g., Fry,* 945 F.Supp. at 667 (noting that *Wieder* is distinguishable from case in which employee alleges that discharge violates *general* ethical requirements).

Finally, at a minimum, plaintiff would be required to prove that he reasonably believed that refusing to fill Prendergast's prescriptions would be violative of Rule 29.2. *See. e.g.,* N.Y. Civ. Serv. L. § 75–b (providing "whistleblower" protection to public employee who provides information to government regarding violation of law employee reason-

ably believes to be true).[6] Plaintiff fails to set forth any evidence that his belief regarding the March 8 and 11 prescriptions would have been reasonable. Prendergrast never told plaintiff that the prescriptions were for medical emergencies. Pl. Dep. at 266. Moreover, plaintiff knew that Prendergast was able to fill the prescriptions at another pharmacy in the area. at 220, 263–264. Therefore, no jury could conclude that plaintiff reasonably believed that refusing to fill Prendergast's prescriptions on March 8 and 11 would be violative of Rule 29.2.

In short, *Wieder* is legally and factually inapplicable. Even if the Court were to recognize the *Wieder* exception in this case, plaintiff fails to raise a factual issue as to any legal or ethical rule that was violated, or that he reasonably believed would be violated by obeying Sims' directive. Defendant's motion for summary judgment is therefore granted, and plaintiff's cross-motion is denied as moot.

## III. CONCLUSION

For all the foregoing reasons, defendant's motion for summary judgment is GRANTED, and the Second Amended Complaint, in its entirety, is DISMISSED. Plaintiff's cross-motion for summary judgment is DENIED as moot.

**IT IS SO ORDERED.**

---

**6.** *But see* Note, *Contract Law—Employment-at-Will—N.Y. Court of Appeals Implies Reporting Requirement into Law Firm–Associate Relationship*, 106 HARV. L. REV.2033 (1993). The author argues that "[u]nder the implied obligation of "good faith and fair dealing" adopted by the [*Wieder*] court, an employee has to establish the bad faith of his employer in order to recover."

*Id.* at 2037. The *Wieder* court, however, did not reach this question. Under the "whistleblower" provision in New York Labor Law § 740, a showing that the employee had a reasonable belief that a violation occurred is insufficient—a showing of an actual violation is required. *See Bordell v. General Elec. Co.*, 208 A.D.2d 219, 622 N.Y.S.2d 1001, 1002 (3d Dep't 1995).