

[739 NYS2d 679]

Sʜᴇɪʟᴀ E. Hᴏʀɴ, Respondent, v Nᴇᴡ Yᴏʀᴋ Tɪᴍᴇs, Appellant.

First Department, March 21, 2002

## APPEARANCES OF COUNSEL

*Pearl Zuchlewski* of counsel (*Geoffrey A. Mort* on the brief; *Goodman & Zuchlewski LLP,* attorneys), for respondent.

*Bernard M. Plum* of counsel (*John F. Fullerton, III,* and *Michael R. Marra* on the brief; *Proskauer Rose LLP,* attorneys), for appellant.

*Donald R. Moy* and *Rita Menchel* for the Medical Society of the State of New York, amicus curiae.

*Leonard A. Nelson* and *Anne M. Murphy* for the American Medical Association, amicus curiae.

*Douglas J. Polk* and *William F. Walsh* of counsel (*Vedder Price Kaufman & Kammholz,* attorneys), for the American College of Occupational and Environmental Medicine, amicus curiae.

*David N. Wynn* of counsel (*Arent Fox Kintner Plotkin & Kahn,* attorneys), for the American Association of Occupational Health Nurses, Inc., amicus curiae.

## OPINION OF THE COURT

ELLERIN, J.

The question presented by this appeal is whether a physician whose employment is terminated because she refuses to share patients' medical records with individuals not authorized to have them has a cause of action against her employer for wrongful discharge. We cannot accept defendant's argument that nothing in the law prevents it from firing the associate director of its medical department for refusing to divulge confidential patient information. Instead, we hold that a physician may claim an exception to New York's employment-at-will doctrine based on an implied-in-law obligation of her employer to, at the very least, do nothing to prevent her from practicing medicine in compliance with the ethical standards of the medical profession.

Contrary to the contention of defendant The New York Times, we conclude that this holding is consistent with the exception to New York's employment-at-will doctrine enunciated by the Court of Appeals in *Wieder v Skala* (80 NY2d 628), limiting a law firm's unfettered right to discharge its associate on the basis of an implied-in-law obligation on the part of the firm to deal fairly and in good faith with the associate. In light of the core characteristics shared by the legal and medical professions as alleged in *Wieder* and here—i.e., the individual practitioner's employment for the purpose of practicing the profession and the importance of professional ethical obligations both to the practitioner's profession and to the public—we conclude that a physician is equally protected by such an exception.

Dr. Horn alleges that in 1996 she became the full-time associate medical director of The New York Times's medical department where her primary duties were to provide "medical care, treatment and advice" to the company's employees, and she was also responsible for examining employees who were seeking Workers' Compensation benefits to verify that their claimed injuries were work-related. Dr. Horn further alleges that on "frequent occasions" various named departments of the company directed her to provide them with confidential medical records of employees "without those employees' consent or knowledge," and that the vice-president for human resources instructed her to "misinform employees regarding whether injuries or illnesses they were suffering were work-related so as to curtail the number of Workers' Compensation claims filed against The Times." Understandably concerned about the

propriety of such requests, Dr. Horn sought advice from the New York State Department of Health, which advised her that such conduct would violate legal and ethical duties to patients. She therefore refused to accede to the requests to turn over patients' medical records to other department heads without the patients' consent and asserts that it was this refusal that shortly thereafter resulted in the termination of her employment, notwithstanding defendant's assertions that such was due to economically induced restructuring of the department.

Relying on *Wieder* (*supra*, 80 NY2d 628), Dr. Horn alleges that implicit in her employment relationship with The Times was an understanding that, having been hired to serve as a physician, she would conduct her practice in accordance with the ethical standards of the medical profession and that, in discharging her for refusing to engage in conduct irreconcilable with those standards, The Times breached this implied term of their employment agreement. The Times moved to dismiss Dr. Horn's complaint of breach of contract for failure to state a cause of action. The IAS court, in a comprehensive opinion (186 Misc 2d 469), denied the motion and this appeal ensued.

On a motion directed to the pleadings, the court's task is to determine only whether the facts as alleged, accepting them as true and according the plaintiff every possible favorable inference, fit within any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83, 87-88).

We recognize, of course, that prior to the decision in *Wieder* (*supra*) it had been New York's long-settled rule, first judicially enunciated in *Martin v New York Life Ins. Co.* (148 NY 117 [1895]), that "where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason" (*Murphy v American Home Prods. Corp.*, 58 NY2d 293, 300). Thus, in *Murphy*, the Court rejected the plaintiff's assertion that the law imposes in every employment contract the requirement that the employer deal with its employees fairly and in good faith and that a discharge in violation of that implied obligation exposes the employer to liability for breach of contract (58 NY2d at 304). The plaintiff argued that by discharging him for disclosing accounting improprieties, which his employer's internal regulations required him to do, his employer failed to act in good faith and thus breached the employment contract. The Court found, however, that the law imposes an obligation of good faith and fair dealing only when such an obligation is "in aid and furtherance of other terms of

the agreement" and, where one such term is the employer's unfettered right to terminate the employment, that situation does not arise (*id.*).

While in *Murphy*, the Court of Appeals acknowledged a trend in other jurisdictions "to temper what is perceived as the unfairness of the traditional rule" (58 NY2d at 301), "being of the opinion that such a significant change in our law is best left to the Legislature" (*id.*), it declined to "judicially engraft[]" a good faith limitation on "the unfettered right of termination lying at the core of an employment at will" in New York (*id.* at 305 n 2). It was noted by the dissent, however, that "[t]he at-will rule was created by the courts and can properly be changed by the courts but, more importantly, * * * the rule has for at least a century been subject to the 'universal force' of the good faith rule. The Legislature, therefore, had no reason before the present decision to believe that action on its part was required" (*id.* at 314 [Meyer, J., dissenting in part]).

Not long after deciding *Murphy*, the Court declined to over-rule its rejection of an implied covenant of good faith in an employment relationship and reaffirmed the employer's right to terminate the employment at any time for any reason, in a case in which the employee argued, not unreasonably, that the law imposes "an obligation on the employer [arising from the latter's express policies] not to fire him for doing what he may be fired for failing to do" (*Sabetay v Sterling Drug*, 69 NY2d 329, 337-338 [Hancock, Jr., J., concurring on constraint of *Murphy*]). In *Sabetay*, the employee had refused to participate in certain illegal activities also involving accounting improprieties.

It is in this setting that the case of *Wieder v Skala* (*supra*, 80 NY2d 628) came before the Court of Appeals. Wieder alleged that the law firm where he was employed as an associate wrongfully discharged him for his insistence that the firm report the professional misconduct of another associate to the Disciplinary Committee as required by DR 1-103 (a) of the Code of Professional Responsibility (22 NYCRR 1200.4 [a]). While noting that Wieder's employment was at will and therefore could be " 'freely terminated by either party at any time for any reason or even for no reason' " (*id.* at 633) in accordance with the decision in *Murphy* (58 NY2d at 300), the Court nevertheless held that Wieder's complaint stated a cause of action for breach of contract based on an implied-in-law obligation in his relationship with the firm (*Wieder* at 638). The Court derived this implied obligation from "the law that in

'every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part' " (*id.* at 637, quoting *Patterson v Meyerhofer*, 204 NY 96, 100). The firm's insistence that Wieder act "unethically and in violation of one of the primary professional rules amounted to nothing less than a frustration of the only legitimate purpose of the employment relationship" (*id.* at 638). Giving effect to an understanding that both Wieder and the firm would comply with professional rules and standards, and that the firm would do nothing to impede or discourage Wieder's compliance, was " 'in aid and furtherance of [the central purpose] of the agreement' " (*id.* at 638, paraphrasing *Murphy, supra*, 58 NY2d at 304).

In light of its narrowly constructed parameters, there has been a reluctance by trial and intermediate appellate courts to interpret the *Wieder* exception as applicable to other occupations or professions (*see, e.g., Civiletti v Independence Sav. Bank*, 236 AD2d 436 [bank employee]; *Leibowitz v Party Experience*, 233 AD2d 481 [chief financial officer]; *DeFilippo v Xerox Corp.*, 223 AD2d 846, *lv dismissed* 87 NY2d 1056 [salesman]; *Haviland v J. Aron & Co.*, 212 AD2d 439, *lv denied* 85 NY2d 810 [commodities broker]; *Mulder v Donaldson, Lufkin & Jenrette*, 208 AD2d 301 [auditor]; *McConchie v Wal-Mart Stores*, 985 F Supp 273 [pharmacist]; *Fry v McCall*, 945 F Supp 655 [public employee]; *McGrane v Reader's Digest Assn.*, 822 F Supp 1044 [auditor]).

It has been suggested that "the New York courts have limited the harshness of the at-will rule's effect especially as to lawyers with no firmer foundation than heightened empathy towards colleagues in their own profession" (*Wolde-Meskel v Tremont Commonwealth Council*, 1994 WL 167977, *3, n 3, 1994 US Dist LEXIS 5464, *8 n 3 [SD NY, Apr. 29, 1994]. The case now before us, however, involves the obligations of a physician, which are significantly different from the obligations that the plaintiffs in the above-cited cases claimed caused their terminations. With all due respect to the other occupations and professions, we find that Dr. Horn's obligation, as a physician, to comply with the Principles of Medical Ethics established by the American Medical Association (and with applicable provisions of the Education Law [*see, e.g.*, § 6530 (definitions of professional misconduct)] and rules promulgated by the Board of Regents [*see, e.g.*, 8 NYCRR 29.1 (b) (unprofessional conduct)]) is analogous to the obligation upon lawyers to comply

with the Code of Professional Responsibility (and Disciplinary Rules [22 NYCRR 1200.1 *et seq.*]).

Particularly relevant to the case before us involving a physician is the Court's analysis in *Wieder* that provided the rationale for exempting a lawyer from the general rule that governed the cases of *Murphy* and *Sabetay*. The Court drew the distinction that "[t]he plaintiffs in those cases were in the financial departments of their employers, both large companies. Although they performed accounting services, they did so in furtherance of their primary line responsibilities as part of corporate management. In contrast, plaintiff's performance of professional services for the firm's clients as a duly admitted member of the Bar was at the very core and, indeed, the only purpose of his association with defendants. Associates are, to be sure, employees of the firm but they remain independent officers of the court responsible in a broader public sense for their professional obligations" (*Wieder, supra* at 635).

The Times argues that the *Wieder* exception to the employment-at-will doctrine is not properly extended beyond the legal profession and that, even if it were, Dr. Horn's complaint must be dismissed because she failed to allege facts sufficient to demonstrate that the medical profession shares the unique characteristics of the legal profession and that her particular situation is substantially identical to Howard Wieder's.

Contrary to The Times's assertions as to the nature of Dr. Horn's employment, Dr. Horn alleges that her primary responsibilities were the provision of medical care, treatment and advice to employees of The Times, and that, among other things, she was responsible for determining whether employees' injuries were work-related and thus rendered the employees eligible for Workers' Compensation. The Times argues that the latter was an evaluative and administrative corporate function and that Dr. Horn is comparable to the plaintiffs in *Murphy* and *Sabetay*, who performed professional services in furtherance of their corporate responsibilities. However, taking Dr. Horn's allegations to be true and resolving all inferences that reasonably flow from them in her favor, and construing such allegations as generally understood, we find the determination of whether an injury is work-related to be a diagnostic function and an integral part of the practice of medicine. Accordingly, Dr. Horn's allegations are sufficient to demonstrate that the practice of medicine was "at the very core" of her employment (*Wieder, supra* at 635).

Any employer who hires a physician to provide medical care knows, or should know as a matter of common knowledge, that the physician is bound by the patient confidentiality provision of the ethical code of the medical profession. That the employer is not a medical entity and therefore is not itself bound by the governing rules and standards of the medical profession does not negate the implied understanding in their relationship that the employer will not impede or discourage the physician's compliance with those particular rules and standards (*Wieder*, *supra* at 638). In place of the mutual obligation is the equally powerful universal understanding that, without a patient's consent, a physician will not disclose to others information obtained in rendering care to the patient. Thus, in hiring Dr. Horn as associate director of its medical department and providing the services of a specific physician to its employees, The Times knew not only that Dr. Horn was bound by patient confidentiality but also that her patients would rightfully presume that she would honor that obligation. It is this knowledge that gives rise to an implied understanding that The Times will, at the very least, do nothing to prevent Dr. Horn from conducting her practice in compliance with that code. As the Court observed in *Wieder*, implying an omitted term in an agreement " 'is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations' " (80 NY2d at 637, quoting 3 Corbin, Contracts § 570, 1992 Supp, at 411).

We must reject The Times's contention that confidentiality is not part of the professional code that is essential to the survival of the medical profession. Quite to the contrary, it is a time-honored, deeply embedded axiom that a physician, like a lawyer, will preserve confidentiality of information acquired from patients. Indeed, the confidentiality rule that Dr. Horn refused to violate is a primary tenet of the medical profession and one of profound importance to patients and to the public.

The obligation to safeguard patients' confidences directly affects the quality of medical care (*cf.*, *Finley v Giacobbe*, 827 F Supp 215, 221). The Times argues that, unlike behavior "central to the *physical practice* of medicine that could actually endanger lives," e.g., drunkenness, gross incompetence or gross negligence, the confidential treatment of medical files is not one of those duties that "truly go to the core of medical treatment." To the contrary, without assurance of the confidential treatment of medical files, patients may suffer equally

grievous harm. Patients frequently are reluctant to disclose information that is personal, embarrassing or potentially incriminating, but effective medical treatment often depends on the physician's possessing precisely that information. Patients who have no confidence that private information will remain between themselves and their physicians may be reluctant to disclose critical facts relating to their complaints or to seek medical attention at all. It is largely for this reason that in 1828 New York State enacted a physician-patient privilege into law (*see, Dillenbeck v Hess*, 73 NY2d 278, 284-285). .

Most of the other states also passed such statutes in the 19th century when legislatures were looking for ways to encourage people with venereal diseases to communicate freely with their doctors (*see*, Clark, *Confidential Communications in a Professional Context: Attorney, Physician, and Social Worker*, 24 J Legal Prof 79, 84 [1999/2000]). More recently, New York State's AIDS Confidentiality Law (Public Health Law §§ 2780-2787) assured strict confidentiality in order to persuade infected people to go into treatment, alter their behavior, and report their status to their sexual and needle-sharing partners (*see*, Salmon, *The Name Game: Issues Surrounding New York State's HIV Partner Notification Law*, 16 NYL Sch J Hum Rts 959, 973-974). These two examples of the importance of physician-patient confidentiality in the care and control of particular diseases demonstrate that the physician's obligation to maintain the confidentiality of patient information has a significant impact on public health as well.

Equally unavailing is The Times's argument that the physician-patient confidentiality obligation cannot be considered a rule essential to the medical profession where, as here, "the employee-patient is fully aware that the physician is employed by the employer and thus has some duty to the employer as well, and is perfectly free to see their own physician rather than the company physician." The patient may know that the physician is also an employee of their mutual employer, but that is hardly a basis upon which to assume that the patient will expect the physician to unethically divulge confidential information or that the employer will improperly seek to obtain that information. Moreover, the directive to provide other department managers with confidential medical records of employees, as alleged, i.e., without those employees' consent or knowledge, belies the implication that an employee who consults the company physician tacitly consents to the physician's disclosure of that employee's medical files to other departments.

The New York Times, by engaging and holding out a licensed physician to provide medical care, treatment and other related benefits to its employees, in their mutual interest, has, at the very least, implied that its physician's services will meet basic standards of professional ethics. No one can reasonably dispute that these employees have a right to rely on the integrity and confidentiality of those proffered medical services. To allow the same employer to provide, and then simultaneously undermine, such a fundamental, personal and vital human service in the manner this defendant suggests, without the knowledge or consent of its employees, is inimical to the foregoing public policy considerations.

In any event, the Council on Ethical and Judicial Affairs of the American Medical Association has stated that "industry employed physicians," i.e., those employed by businesses to perform "an isolated assessment of an individual's health or disability for an employer, business, or insurer," have the same obligation to maintain patient confidentiality as physicians who are independent contractors (brief of amicus curiae, Appendix A, at 1-2). The Council's Opinion E-5.09 elaborates on this obligation:

> "Where a physician's services are limited to performing an isolated assessment of an individual's health or disability for an employer, business, or insurer, the information obtained by the physician as a result of such examinations is confidential and should not be communicated to a third party without the individual's prior written consent, unless required by law. If the individual authorized the release of medical information to an employer or a potential employer, the physician should release only that information which is reasonably relevant to the employer's decision regarding that individual's ability to perform the work required by the job."

Moreover, as to the importance of the confidentiality provision of the ethical code, a physician's "[r]evealing of personally identifiable facts, data, or information obtained in a professional capacity without the prior consent of the patient, except as authorized or required by law," is professional misconduct (Education Law § 6530 [23]; see also, 8 NYCRR 29.1 [b] [8]) grave enough to be grounds for the suspension or revocation of her license to practice medicine (Public Health Law § 230-a).

Much is made of the fact that, unlike the situation in *Wieder* (*supra*), where both the plaintiff employee and the defendant

employer were engaged in the practice of law, in this case the defendant employer is not engaged along with the plaintiff employee in the practice of medicine. It is significant, however, that The Times, a universally respected news organization, itself provides an essential service to the public that entails conforming to certain standards of truth, integrity and confidentiality of its news sources (*see, e.g.,* Shield Law [Civil Rights Law § 79-h]). That its employee refuses to violate parallel rules of confidentiality governing her practice of medicine can hardly be said to be "inconsistent with" and "destructive of" the core purpose of their agreement, the rationale underlying the decisions in *Murphy* and *Sabetay* (*see, Wieder, supra* at 638).

We conclude by noting that we believe physicians are, no less than lawyers, entitled to the trust, respect and esteem that an implied-in-law obligation of their employers to deal with them fairly and in good faith bespeaks. Associates who are employees of a law firm "remain independent officers of the court responsible in a broader public sense for their professional obligations," the Court of Appeals said in *Wieder* (at 635). Physicians too are independent professionals responsible in a broader public sense for their professional obligations. The Principles of Medical Ethics of the American Medical Association (1980) state that "a physician must recognize responsibility not only to patients, but also to society, to other health professionals, and to self." Physicians are responsible for maintaining the public's confidence in their integrity and the medical profession (*see, e.g.,* Education Law § 6530 [17], which makes it professional misconduct to "exploit the patient for the financial gain * * * of a third party"). Thus, contrary to the dissent, the rules governing the medical profession are not addressed solely to the relationship between practitioner and patient but have a far broader public impact, comparable to that of the rules regulating the legal profession. A physician hired to practice medicine is as different from a corporate manager as is an associate of a law firm.

Accordingly, the order of the Supreme Court, New York County (Edward Lehner, J.), entered December 18, 2000, which denied defendant's motion to dismiss the first cause of action for breach of an implied contract and granted its motion to dismiss the second cause of action for punitive damages, should be affirmed, without costs.

WALLACH, J. (dissenting). Plaintiff, a licensed physician, was

hired by oral contract, ordinarily terminable at will, to serve as a doctor and medical administrator for the company's personnel. The complaint alleges that in the course of this employment, defendant directed plaintiff to disclose the contents of confidential medical records, without employee knowledge or consent, pertaining to workers' compensation claims, purportedly in violation of various ethical guidelines governing her profession (*see, e.g.*, Education Law § 6530 [23]; 8 NYCRR 29.1 [b] [8]). Her employment was terminated, allegedly because she refused to comply.

Defendant moved to dismiss for failure to state a cause of action. The IAS court ruled that since such unauthorized disclosure of confidential patient information would have constituted professional misconduct, plaintiff's discharge for her ethically premised conduct sustained a viable cause of action for breach of an implied provision of her contract of employment. We disagree, and would reverse and grant defendant's motion to dismiss the complaint.

Absent a constitutionally impermissible purpose, a statutory proscription or a fixed term contained in the individual employment contract itself, an employer's right to terminate an employment at will remains unimpaired in New York (*Murphy v American Home Prods. Corp.*, 58 NY2d 293). An employee at will has no implied contractual right to continued employment, and thus the relationship can be terminated at any time by the employer, for virtually any reason.

The Court of Appeals has carved out one very limited exception to this rule in the case of an associate attorney who claimed wrongful discharge by his law firm after he had notified his senior partners about unethical conduct by another member of the firm and had urged them to report the matter to the Appellate Division's Departmental Disciplinary Committee (*Wieder v Skala*, 80 NY2d 628). When the law firm failed to act, Mr. Wieder reported his colleague to the disciplinary authorities, whereupon the law firm (*a*) also reported the matter, and (*b*) then fired Wieder, allegedly in retaliation. The IAS court in the case at bar concluded that the *Wieder* rationale entitled plaintiff herein to a similar exception.

Obviously, Dr. Horn's claim here strikes a sympathetic, and even a seductive, chord. In one federal case involving an at-will employee's action for wrongful discharge (*Wolde-Meskel v Tremont Commonwealth Council*, 1994 US Dist LEXIS 5464, 1994 WL 167977 [SD NY, Apr. 29, 1994]), the court noted (at *8 n 3, *3 n 3):

"Although it might be argued that the New York courts have limited the harshness of the at-will rule's effect especially as to lawyers with no firmer foundation than heightened empathy towards colleagues in their own profession, such a limitation would be nonetheless within the province of the state courts."

While whimsical in tone, the subtext of this observation is clear enough. And, to the extent that such a thought could be perceived as an operational rationale to any degree, an immediately attractive and surely remedial response might be to enlarge membership in the favorably protected class to include the medical practitioner. In good time, other professional employees might well be invited to seek shelter under the ever expanding *Wieder* big tent. But in light of existing law in this state, we, as an intermediate appellate court, must resolutely resist that temptation.

Any rule of law purporting to regulate at-will employment contracts has the widest application and economic impact. For example, courts are legislatively bound to address certain discriminatory activity, under constitutional equal protection principles (age, race, sex, disability). All the more reason that when an employee seeks regulation of an employer's ethical conduct by means which have far-reaching economic implication, the judgment as to the best method of restraint requires the broad investigatory resources of the Legislature. In other words, the area of economic consideration is one far better left to legislative remedy (*Wieder v Skala, supra* at 639; *Sabetay v Sterling Drug*, 69 NY2d 329, 336-337). The Legislature has so moved to protect employees from employer actions in certain narrow circumstances, e.g., Executive Law § 296 (1) (e) (retaliation against an employee who objects to, or blows the whistle about, an employer's violation of the Human Rights Law), Labor Law § 740 (retaliation against an employee who objects to, or blows the whistle about, an employer's health and safety violations) or § 215 (any other violations of the Labor Law), Civil Service Law § 75-b (retaliatory action by public employers), and Judiciary Law § 519 (penalizing an employee for answering a call to jury duty). Each of these narrow areas of prohibition clearly resulted from extensive legislative study and action. For our Court now to extend the protective umbrella over a much broader class of employees for other unspecified employer improprieties would seemingly exceed the appropriate judicial role.

As the Court of Appeals noted in *Sabetay (supra)*, the desire for stability and predictability in the sensitive area of employment contractual relations has resulted in the erection of a protective wall against judicial intervention, breach of which has traditionally been envisaged as solely a legislative prerogative. To date, *Wieder* is the only exception to this rule (*see, Lichtman v Estrin*, 282 AD2d 326), and courts have resisted the invitation to expand that exception to other licensed businesses or professions (*see, e.g., Civiletti v Independence Sav. Bank*, 236 AD2d 436 [bank employee]; *Leibowitz v Party Experience*, 233 AD2d 481 [chief financial officer]; *DeFilippo v Xerox Corp.*, 223 AD2d 846, 848, *lv dismissed* 87 NY2d 1056 [salesman]; *Haviland v J. Aron & Co.*, 212 AD2d 439, *lv denied* 85 NY2d 810 [commodities broker]; *Mulder v Donaldson, Lufkin & Jenrette*, 208 AD2d 301 [auditor]; *McConchie v Wal-Mart Stores*, 985 F Supp 273 [pharmacist]; *Fry v McCall*, 945 F Supp 655 [public employee]; *McGrane v Reader's Digest Assn.*, 822 F Supp 1044, 1048-1049, 863 F Supp 183, 185, *affd* 60 F3d 811 [investigator]). Plaintiff has not established that the status of her profession demands similar treatment.

It should also be noted that viewed from the perspective of any licensed professional, the *Wieder* exception to the *Murphy* rule provides a double-edged sword. While it may be a boon to the employed professional, it simultaneously creates a severe constraint upon the *employer*-professional's freedom of action, a consideration that must give pause to proponents of a *Wieder* expansion.

The *Wieder* exception makes it clear that the outcome in a wrongful discharge case depends less on the details of the employer's alleged misconduct than on the nature of the professional relationship between employer and employee. In *Sabetay v Sterling Drug (supra)*, an accountant serving as in-house director of corporate financial projects asserted he had been fired after refusing to condone slush-fund payments to foreign officials and other illegal tax-avoidance activities. Notwithstanding provisions in Sterling's employee manual requiring reportage of illegal activities, the Court of Appeals held that the plaintiff still had not satisfied his burden to establish an express limitation on the company's virtually unfettered authority to discharge an at-will employee.

Ethical rules governing the medical profession are primarily addressed to the relationship between practitioner and patient. By contrast, the *Wieder* exception found an implied-in-law obligation of fair dealing and good faith, *unique to the practice*

*of law,* in the distinctive relationship between a lawyer-associate and his firm. Intrinsic in every such relationship, the Court of Appeals held, is "the unstated but essential compact that in conducting the firm's legal practice both [the associate] and the firm would do so in compliance with the prevailing rules of conduct and ethical standards of the profession." (80 NY2d at 637-638.) A law firm's insistence that its employed attorney violate those rules would frustrate the very essence of the common enterprise they share, in a profession whose disciplinary self-regulation is essential to its very survival in our society.

The parties presently before this Court—a newspaper publisher and the associate director of its medical department—were not engaged in a common professional enterprise. By no characterization were plaintiff and her employer professionally joined in the practice of medicine or the delivery of health-care services. As we see it, the major flaw in the majority argument sustaining this complaint rests in its denigration of this "common enterprise" component that is so essential to the *Wieder* exception. The contract cause of action sustained herein rests entirely upon an alleged breach of the implied covenant of good faith and fair dealing; this covenant need not be expressed, precisely because the common enterprise upon which both parties are embarked triggers its *mutual* application. The implied covenant, as indicated by the majority's reliance upon Professor Corbin's dictum, is that there is a silent but overarching term of ethical conduct recognition only where the parties' shared understandings or expectations are so fundamental that they need not even be negotiated. No such expectations can be found to operate with equal force upon both parties in this context.

Responding to this serious departure from the *Wieder* rationale, the majority offers as a viable substitute defendant's ethical obligation to conform to the lofty standards of "truth, integrity and confidentiality" (referencing the journalist's privilege to protect confidential news sources) in delivering its "essential service to the public." To adopt this standard would be to expand application of the *Wieder* exception to any situation where assertion of an employee's ethical obligations results in retaliatory discharge, as long as the employer's business is arguably subject to another, completely unrelated, set of ethical standards. We would be surprised if the *Wieder* Court ever contemplated even the possibility of such an extraordinary enlargement.

The IAS court granted defendant's motion only to the extent of dismissing the second cause of action, asserting a claim for punitive damages. The first cause of action, alleging breach of an implied contract, should also have been dismissed.

Motions seeking leave to appear as amici curiae granted.

ROSENBERGER and MARLOW, JJ., concur with ELLERIN, J.; SULLIVAN, J.P., and WALLACH, J., dissent in a separate opinion by WALLACH, J.

Order, Supreme Court, New York County, entered December 18, 2000, affirmed, without costs. Motions seeking leave to appear as amici curiae granted.