Smith, J.
(dissenting). Because I believe that plaintiff Sheila Horn has stated a claim for breach of an implied contract between herself and defendant the New York Times, I dissent. I would affirm the order of the Appellate Division.
Plaintiff began her employment as a physician with the Times in 1995. In 1996, she became the full-time Associate Medical Director of the Times’ Medical Department. Sometime in April 1999, however, Dr. Horn was terminated. In April 2000, she commenced an action, alleging breach of contract (first cause) and an entitlement to punitive damages (second cause). In May 2000, the Times filed a preanswer motion to dismiss the complaint for failure to state a cause of action. Supreme Court denied the motion as to the first cause, finding that Dr. Horn had stated a claim for breach of an implied contract of employment. Supreme Court reasoned that the strictures imposed upon those in the medical profession, and the resulting responsibility to the public, warranted extension of the principles set forth in Wieder v Skala (80 NY2d 628 [1992]). Supreme Court granted the motion as to the second cause which asserted only a claim for punitive damages. The Appellate Division affirmed, with two Justices dissenting (293 AD2d 1 [2002]). The Appellate Division certified to this Court the question of whether it had correctly affirmed Supreme Court.
“On a motion to dismiss pursuant to CPLR 3211, we must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory” (Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 [2001] [citations omitted]). If the motion is denied, defendant has the right to submit an answer and address the merits.
*98 Dr. Horn’s complaint alleged that her primary responsibilities were to provide “medical care, treatment and advice” to the company’s employees and to examine employees seeking workers’ compensation benefits to verify that their claims were work related. She farther alleged that on “frequent occasions” various named departments of the company directed her to provide them with confidential medical records of employees “without those employees’ consent or knowledge,” and that the vice-president for human resources instructed her to “misinform employees regarding whether injuries or illnesses they were suffering were work-related so as to curtail the number of Workers’ Compensation claims filed against the Times.” After seeking advice from the New York State Department of Health, she was told “if a physician releases patient information and/or medical records without the consent of the patient, except under certain, narrowly-defined circumstances, that physician is violating several provisions of state law, the Code of Ethical Conduct of the American College of Occupational and Environmental Medicine, the Americans With Disabilities Act, and various federal regulations.” Thereafter, she refused to comply with requests to turn over patients’ medical records to other department heads without the patients’ consent.
In April 1999, the human resources vice-president announced that the Times was restructuring the medical department and as a result the positions of Dr. Horn and Dr. DiPietro were eliminated. DiPietro had also failed to comply with requests from labor relations and other Times’ departments for patient medical records without those patients’ consent. Dr. Horn asserted that the Times thereafter contracted with Meridian Corporate Healthcare to provide a physician to work three days per week at the Times’ main office, the place where she had worked. Dr. Horn asserted that she applied for the position but was not granted an interview. Human resources asserted economic reasons for the restructuring of the medical department. Dr. Horn alleged that she was terminated because she refused to comply with requests for confidential patient records and that her termination constituted a breach of the implied terms and conditions of the agreement between herself and the Times.
In hiring Dr. Horn, the Times impliedly committed to permitting her to perform her professional responsibilities in a manner not inconsistent with the ethical practice of medicine, and because Dr. Horn alleged in her complaint that the Times breached that agreement, she has stated a cognizable cause of action.
*99 In its decision, the Supreme Court stated:
“The conduct that plaintiff herein asserts resulted in her discharge is not merely ‘whistle blowing’ type activity * * * but rather is affirmative conduct which defendant allegedly requested plaintiff to perform which could have an adverse [e]ffect on her patients and result in her losing her license to practice medicine, as well as the imposition of civil liability” (Horn v New York Times, 186 Misc 2d 469, 474 [2000]).
The Appellate Division stated:
“We cannot accept defendant’s argument that nothing in the law prevents it from firing the associate director of its medical department for refusing to divulge confidential patient information. Instead, we hold that a physician may claim an exception to New York’s employment-at-will doctrine based on an implied-in-law obligation of her employer to, at the very least, do nothing to prevent her from practicing medicine in compliance with the ethical standards of the medical profession” (Horn v New York Times, 293 AD2d 1, 3 [2002]).
Prior to the decision in Wieder v Skala, the long settled rule in New York was that “where an employment [was] for an indefinite term it [was] presumed to be a hiring at will which [might] be freely terminated by either party at any time for any reason or even for no reason” (Murphy v American Home Prods. Corp., 58 NY2d 293, 300 [1983] [citations omitted]). Accordingly, the Murphy Court declined to “judicially engraft[]” a good faith limitation on “the unfettered right of termination lying at the core of an employment at will” {id. at 305 n 2). Judge Meyer, on the other hand, noted in dissent that “[t]he at-will rule was created by the courts and can properly be changed by the courts but, more importantly, * * * the rule ha[d] for at least a century been subject to the ‘universal force’ of the good faith rule. The Legislature, therefore, had no reason before the [Murphy] decision to believe that action on its part was required” (id. at 314).
In Wieder, however, this Court recognized that in certain contractual situations, an obligation of good faith and fair dealing arises which limits an employer’s unfettered right to terminate at will. In Wieder, an associate who had been working for a law firm brought a claim alleging that the firm in *100 terminating him breached an implied term of his contract— that the firm would do nothing to subvert the associate’s ethical and lawful practice of law. The associate alleged that he had been wrongfully terminated because he insisted that the firm comply with DR 1-103 (a) of the Code of Professional Responsibility (22 NYCRR 1200.4), which requires an attorney to report the professional misconduct of another attorney.[1] In his complaint, the associate alleged that the firm had agreed to represent him in the purchase of a condominium apartment and had assigned a fellow associate to do everything that needed to be done. The fellow associate neglected the transaction for several months and made “false and fraudulent material misrepresentations” to conceal his neglect (80 NY2d at 632). When the associate learned of his fellow associate’s neglect and false statements, he advised two senior partners. They conceded that they were aware of the fellow associate’s having lied about pending legal matters on other occasions. The fellow associate admitted in writing that he had committed several acts of legal malpractice, fraud and deceit upon the associate and other clients. The associate alleged that the firm’s partners refused to report the misconduct to the Appellate Division Disciplinary Committee as required under DR 1-103 (a). The associate met with the Committee, but later withdrew his complaint, he alleged, because the firm had indicated that he would be terminated if he reported the misconduct of his fellow associate. Plaintiff alleged he was berated, and, after completing important litigation, was terminated.
This Court, in seeking to determine if an obligation of good faith and fair dealing could be implied in the contract, observed:
“It is the law that in ‘every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.’ The idea is simply that when A and B agree that B will do something it is understood that A will not prevent B from doing it. The concept is rooted in notions of common sense *101 and fairness * * *. [It is] a recognition that the parties occasionally have understandings or expectations that [are] so fundamental that they [do] not need to negotiate about those expectations” (id. at 637 [citations and internal quotation marks omitted]).
The Court also examined the nature of the relationship between the associate and the firm to see what could be implied in the contract. The Court observed that the relationship between the law firm and the lawyer hired as an associate was unique because (1) the associate was specifically hired to perform services for clients as a duly admitted member of the bar, but at the same time, the associate remained an independent officer of the court responsible to a broader public sense of professional obligations; (2) particularly critical to “survival of the [legal] profession” (id. at 636) was the obligation of self regulation imposed by DR 1-103 (a); and finally (3) because the associate and the firm were engaged in a common professional enterprise each was governed by the same general “rules of conduct and ethical standards * * * in carrying out the sole aim of their joint enterprise, the practice of their profession.” (Id. at 638.) The Court recognized that “[i]ntrinsic to this relationship, of course, was the unstated but essential compact that in conducting the firm’s legal practice both plaintiff and the firm would do so in compliance with the prevailing rules of conduct and ethical standards of the profession. Insisting that as an associate in their employ plaintiff must act unethically and in violation of one of the primary professional rules amounted to nothing less than a frustration of the only legitimate purpose of the employment relationship” (id. at 637-638).
As in Wieder, a similar promise by the Times, to permit Dr. Horn to perform her professional responsibilities in a manner not inconsistent with the ethical practice of medicine, should be implied in its relationship with plaintiff. Dr. Horn alleges that the Times hired her to perform core medical duties for clients. Specifically, she alleges that she was hired to provide “medical care, treatment and advice” to the company’s employees and to examine employees seeking workers’ compensation benefits to verify that their claims were work related. Such duties required her to use the medical skills she had acquired through training and practice as a physician. Dr. Horn makes no allegation that can reasonably be read to assert that she was hired to do anything but perform as a physician. The majority would distinguish Dr. Horn’s duties at the Times as incorporating “corporate management” duties to be distin *102 guished from “the very core” or “only purpose” attorney duties of the associate in Wieder (majority op at 95). The associate in Wieder did not plead in his amended complaint that his attorney functions were his “sole functions”; rather, he pleaded that he “was associated with the law firm * * * and practiced solely in the area of commercial litigation.”
As stated by the majority at the Appellate Division, “Any employer who hires a physician to provide medical care knows, or should know as a matter of common knowledge, that the physician is bound by the patient confidentiality provision of the ethical code of the medical profession” (293 AD2d at 8). Like the associate in Wieder, Dr. Horn remained a duly admitted member of a professional body and was bound by its rules. The American Medical Association Code of Medical Ethics both requires the confidentiality of information obtained by a physician in plaintiffs position and the reporting of physicians who violate that confidentiality.[2] In addition, section 6530 (23) of the Education Law defines as professional misconduct, the *103 “[r]evealing of personally identifiable facts, data, or information obtained in a professional capacity without the prior consent of the patient * * Section 6509 (9) of the Education Law defines professional misconduct to include “Committing unprofessional conduct, as defined by the board of regents.” Section 29.1 (b) (8) of the Rules of the Board of Regents (8 NYCRR) defines professional misconduct to include the “revealing of personally identifiable facts, data or information obtained in a professional capacity * * The State of New York Department of Health has set forth a penalty of censure, reprimand, suspension of license, revocation of license, annulment of license, limitation on further license or fine for a person found guilty of professional misconduct (see Public Health Law § 230-a). The Department has suspended the license of a physician who evidenced moral unfitness by engaging in sexual relations with his patients, who revealed patient information without consent, who harassed and/or intimidated a patient and who failed to maintain accurate information (see Matter of Dieter H. Eppel, M.D., Determination and Order No. 02-82 of Professional Med Conduct Admin Review Bd; see also Matter of James Y. Severinsky, M.D., Determination and Order No. BPMC 00-226 of NY State Bd of Professional Med Conduct [suspending the license of a physician who revealed patient’s personally identifiable information obtained in a professional capacity without patient’s consent and committed professional misconduct by practicing fraudulently and advertising falsely]; Matter of James L. Duffy, M.D., Determination and Order No. BPMC 00-129 of NY State Bd of Professional Med Conduct [suspending the license of physician who engaged in sexual relations with a patient, revealed personally identifiable facts, data, or information about patient without consent, was grossly negligent, negligent and failed to maintain accurate records]).
The Department of Health, like the Departments of the Appellate Division, is responsible for maintaining standards and ethics of the profession and for enforcing those standards. In addition, the Principles of Medical Ethics of the American Medical Association states that physicians, including physicians employed by industry, have an ethical and legal duty to protect patient confidentiality and thus not to reveal confidential communications without the consent of the patient. The critical similarity between the rule governing Dr. Horn and the *104 rule governing the associate in Wieder is not that the rule needs to reflect the profession’s self-governing function — this is just a particular function of the legal profession. What is critical is that the profession regards the rule as intrinsic to its survival as a profession.
As to the third factor, the so called common enterprise factor, I agree with the Appellate Division that although Dr. Horn and the Times were not engaged in the same work, it is beyond cavil and universally known that a physician owes her patients a duty of confidentiality. Indeed, this Court observed in Matter of Grand Jury Investigation in N.Y. County (98 NY2d 525 [2002]) that the physician-patient privilege served three functions: (1) it “seeks to maximize unfettered patient communication with medical professionals, so that any potential embarrassment arising from public disclosure will not deter people from seeking medical help and securing adequate diagnosis and treatment”; (2) it “encourages medical professionals to be candid in recording confidential information in patient medical records * * and (3) it “protects patients’ reasonable privacy expectations against disclosure of sensitive personal information” (id. at 529 [citations and internal quotation marks omitted]). Just because the Times was “not a medical entity and therefore [was] not itself bound by the governing rules and standards of the medical profession [did] not negate the implied understanding in their relationship that the employer will not impede or discourage the physician’s compliance with those particular rules and standards” (Horn v New York Times, 293 AD2d at 8, citing Wieder at 638).
This State’s interest in protecting both the employer’s and the employee’s freedom of contract undergirds the employment-at-will doctrine. Nevertheless, even if the facts alleged in the complaint did not come within the Wieder rule, the strictures of the at-will doctrine itself, a judge-made doctrine, have been subject to a limited number of statutory exceptions (see Labor Law § 741 [2] [a] [preventing retaliatory discharge of health care employee making report of improper quality of patient care]; Labor Law § 740 [preventing retaliatory discharge against an employee who reports an employer’s illegal activity creating a substantial and specific danger to public health and safety]; Civil Service Law § 75-b [preventing retaliatory discharge of public employee who reports violation of federal, state or local law]; see also National Labor Relations Act of 1935, 29 USC § 158 [defining unfair labor practices]; Civil Rights Act of 1964 tit VII, 42 USC § 2000e et seq. [stating that *105 it shall be an unlawful employment practice to discriminate against members of named suspect categories]).
It should be emphasized, however, that Dr. Horn’s claim comes within the limited exception to the at-will doctrine carved out in Wieder, legal professionals (here medical professionals) performing public duties, not corporate duties, whose employers take adverse action against them because they insist upon complying with an identifiable statutory duty or ethical principle which is at the core of their profession. The contention of the majority that the dissent advocates a broad application of Wieder to all professionals is a misreading. Rather the dissent contends only that the rules and obligations which govern the conduct of doctors are similar to the rules applicable to lawyers. The most obvious of these rules is confidentiality.
No sound reason exists to preclude termination of a lawyer in Wieder while leaving without a remedy a doctor whose job it is to protect the physical and mental well-being of individuals. Even though the Times is not in the business of practicing medicine, “[i]t is significant * * * that The Times, a universally respected news organization, itself provides an essential service to the public that entails conforming to certain standards of truth, integrity and confidentiality of its news sources (see, e.g., Shield Law [Civil Rights Law § 79-h])” (Horn v New York Times, 293 AD2d at 11).
Accordingly, I would affirm.
Judges Ciparick, Wesley, Rosenblatt and Graffeo concur with Judge Read; Judge Smith dissents and votes to affirm in a separate opinion; Chief Judge Kaye taking no part.
Order reversed, etc.

. DR 1-103 (a) provided: “A lawyer possessing knowledge, (1) not protected as a confidence or secret, of a violation of DR 1-102 that raises a substantial question as to another lawyer’s honesty, trustworthiness or fitness in other respects as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.”

. Rule E-5.09 of the Code of Medical Ethics states in part:
“Where a physician’s services are limited to performing an isolated assessment of an individual’s health or disability for an employer, business, or insurer, the information obtained by the physician as a result of such examinations is confidential and should not be communicated to a third party without the individual’s prior written consent, unless required by law. If the individual authorized the release of medical information to an employer or a potential employer, the physician should release only that information which is reasonably relevant to the employer’s decision regarding that individual’s ability to perform the work required by the job.
‘When a physician renders treatment to an employee with a work-related illness or injury, the release of medical information to the employer as to the treatment provided may be subject to the provisions of worker’s compensation laws. The physician must comply with the requirements of such laws, if applicable. However, the physician may not otherwise discuss the employee’s health condition with the employer without the employee’s consent or, in the event of the employee’s incapacity, the appropriate proxy’s consent.”
Rule E-9.031 of the Code of Medical Ethics states in part:
“Physicians have an ethical obligation to report impaired, incompetent, and unethical colleagues in accordance with the legal requirements in each state and assisted by the following guidelines: * * *
“Unethical conduct. With the exception of incompetence or impairment, unethical behavior should be reported in accordance with the following guidelines:
“Unethical conduct that threatens patient care or welfare should be reported to the appropriate authority for a particular clinical service. Unethical behavior which violates state licensing provisions should be reported to the state licensing board or impaired physician programs, when appropriate. Unethical conduct which violates criminal statutes must be reported to the
*103 appropriate law enforcement authorities. All other unethical conduct should be reported to the local or state medical society.”