100 N.Y.2d 85 (2003)
790 N.E.2d 753
760 N.Y.S.2d 378
SHEILA E. HORN, Respondent,
v.
NEW YORK TIMES, Appellant.
Court of Appeals of the State of New York.
Argued January 15, 2003.
Decided February 25, 2003.
*86 Proskauer Rose LLP, New York City (Bernard M. Plum, John F. Fullerton III and Michael R. Marra of counsel), for appellant.
Goodman & Zuchlewski LLP, New York City (Pearl Zuchlewski and Geoffrey A. Mort of counsel), for respondent.
*87 Holland & Knight LLP, New York City (Frederick D. Braid of counsel), and Jaye Pershing Johnson for New York City Partnership, amicus curiae.
Stein & Schonfeld, Garden City (Seth P. Stein and Robert L. Schonfeld of counsel), for New York State Psychiatric Association, Inc., and others, amici curiae.
Kudman Trachten LLP, New York City (Gary Trachten of counsel), for National Employment Lawyers Association/New York, amicus curiae.
*88 Donald R. Moy, Lake Success, for Medical Society of the State of New York and others, amici curiae.
Rice & Justice, Albany (John Carter Rice, Lawrence P. Justice and Bradley F. Rice of counsel), for Business Council of New York State, Inc., amicus curiae.
Judges CIPARICK, WESLEY, ROSENBLATT and GRAFFEO concur with Judge READ; Judge SMITH dissents and votes to affirm in a separate opinion; Chief Judge KAYE taking no part.

*89 OPINION OF THE COURT
READ, J.
At issue in this appeal is whether the narrow exception to the at-will employment doctrine adopted in Wieder v Skala (80 NY2d 628 [1992]) encompasses a physician employed by a nonmedical employer. For the reasons that follow, we conclude that it does not and decline to expand the Wieder exception to do so. Accordingly, we reverse.

I.
In her complaint, Sheila E. Horn, D.O., formerly the Associate Medical Director of the Medical Department of the New York Times, alleges that her "primary responsibilities" in this position "were to provide medical care, treatment and advice to employees of the Times. Among other things, * * * determining if injuries suffered by Times employees were work-related, thus making the employees eligible for Worker's Compensation payments." She worked at the Times' main building in midtown Manhattan, along with the Medical Director, a physician's assistant, two nurses and three professional social workers.
According to Horn, on "frequent occasions" personnel in the Times' Labor Relations, Legal and Human Resources Departments directed her to provide them with confidential medical records of employees without the employees' consent or knowledge. She also claims that personnel in the Times' Human Resources Department instructed her to misinform employees whether their injuries and illnesses were work-related so as to curtail the number of workers' compensation claims filed against the newspaper.
Horn "consulted with the New York State Department of Health and other authorities" about "the propriety and legality" of these directives. The Department of Health supposedly advised her that "if a physician releases patient information and/or medical records without the consent of the patient, except under certain, narrowly-defined circumstances, that physician is violating several provisions of state law, the Code of Ethical Conduct of the American College of Occupational and Environmental Medicine, the Americans With Disabilities Act, and various federal regulations." Accordingly, Horn *90 disregarded her employer's orders and refused to share patient information or records with nonmedical Times personnel without patient consent or knowledge.
In April 1999, the Times decided to restructure its Medical Department, resulting in the "phas[ing] out" of the positions occupied by Horn and the Medical Director and physician's assistant with whom she had worked, but not those of other professional personnel in the Medical Department. Horn contends that this restructuring and the Times' outsourcing of certain medical services were mere pretexts; that the Times, in fact, undertook these actions in order to get rid of her because she was viewed as a troublemaker.
Horn contends that her contract of employment with the Times "implied the fundamental understanding, which requires no written expression, that the physician will conduct her practice on the employer's behalf in accordance with the ethical standards of the medical profession" (emphasis added). She alleges that the Times terminated her employment because she resisted management's entreaties to trench upon patient confidentiality in violation of unexpressed but commonly understood ethical standards, and seeks compensatory and punitive damages for breach of contract.
The Times made a preanswer motion to dismiss Horn's complaint for failure to state a cause of action. Supreme Court denied the motion as to the first cause of action for breach of contract. Characterizing the issue presented as "whether the exception enunciated in Wieder v Skala (80 NY2d 628 [1992]) to New York's rule relating to employment at will should be extended to a physician employed by a nonmedical entity," Supreme Court concluded that it should (186 Misc 2d 469, 470 [2000]).[1] The Appellate Division affirmed, with two Justices dissenting (293 AD2d 1 [2002]), and subsequently certified the following question to this Court: "Was the order of [the Appellate Division], which affirmed the order of the Supreme Court, properly made?"

II.
The traditional American common-law rule undergirding employment relationships, which we adopted in Martin v New York Life Ins. Co. (148 NY 117 [1895]), is the presumption that *91 employment for an indefinite or unspecified term is at will and may be freely terminated by either party at any time without cause or notice. While the twentieth century featured significant statutory inroads into the presumption of at-will employment, most notably with passage of the National Labor Relations Act in 1935 and title VII of the Civil Rights Act of 1964, American courts have proved chary of creating common-law exceptions to the rule and reluctant to expand any exceptions once fashioned (see Summers, Employment at Will in the United States: The Divine Right of Employers, 3 U Pa J Lab & Emp L 65 [2000]). Our own jurisprudence reflects this pattern, as a brief examination of our major cases over the last 20 years illustrates.
In Weiner v McGraw-Hill, Inc. (57 NY2d 458 [1982]), plaintiff Weiner alleged that he was induced to leave his former employer for McGraw-Hill by assurances of job security. He claimed that he signed and submitted a McGraw form job application specifying that his employment was subject to McGraw's handbook on personnel policies and procedures, which represented that McGraw would "resort to dismissal for just and sufficient cause only, and only after all practical steps toward rehabilitation or salvage of the employee have been taken and failed" (id. at 460); that he relied on these undertakings in good faith when he left his former employer to work for McGraw, thereby forfeiting accrued fringe benefits and foregoing a promised salary increase; that he routinely rejected other offers of employment to remain at McGraw because of these assurances; and that he was instructed by his supervisors to adhere strictly to the handbook's procedures when considering the dismissal of subordinates. When Weiner was subsequently dismissed without just cause or an opportunity for rehabilitation, we found these cumulative factors sufficient to state a cause of action for breach of contract.
A scant four months later in Murphy v American Home Prods. Corp. (58 NY2d 293 [1983]), we considered whether a long-tenured corporate employee allegedly discharged in part[2] for reporting accounting improprieties to top management had stated a cause of action in tort for abusive discharge, or in contract for breach of an implied covenant of good faith and fair dealing. Plaintiff Murphy, an assistant treasurer in a corporation, urged us to recognize the tort of abusive or wrongful *92 discharge of an at-will employee, pointing out that other jurisdictions had done so where employees were dismissed in retaliation for employee conduct protected by public policy.
Judge Jones, writing for the majority, emphatically turned down Murphy's invitation, "being of the opinion that such a significant change in our law is best left to the Legislature," which is well-situated "to discern the public will, to examine the variety of pertinent considerations, to elicit the views of the various segments of the community that would be directly affected and in any event critically interested, and to investigate and anticipate the impact of" any major change in the at-will employment rule (id. at 301, 302). In short, if this rule were "to be tempered, it should be accomplished through a principled statutory scheme, adopted after opportunity for public ventilation, rather than in consequence of judicial resolution of the partisan arguments of individual adversarial litigants" (id. at 302).
Murphy further argued that the law implies a covenant of good faith and fair dealing in all contracts, including employment contracts of indefinite duration; that he was required to disclose accounting improprieties by virtue of his terms of employment; and therefore that his employer's discharge of him for having done so constituted a breach of contract. Citing the venerable case of Wood v Duff-Gordon (222 NY 88 [1917]), Judge Jones acknowledged that New York recognizes an implied and enforceable obligation of good faith and fair dealing on the part of a party to a contract in appropriate circumstances; however,
"[i]n such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship. * * * [U]nder New York law as it now stands, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired" (58 NY2d at 304-305 [emphasis added]).
We next visited at-will employment in Sabetay v Sterling Drug (69 NY2d 329 [1987]). Plaintiff Sabetay asserted that he was discharged on account of his refusal to participate in certain improper, unethical and illegal financial activities in *93 violation of contractual obligations derived from the corporate personnel policy manual and the corporation's accounting code. We reiterated that a covenant of good faith and fair dealing "can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract" (id. at 335); and again observed that "significant alteration of employment relationships * * * is best left to the Legislature [citation omitted], because stability and predictability in contractual affairs is a highly desirable jurisprudential value" (id. at 336).
In Weiner, Murphy and Sabetay, we thus exhibited a strong disinclination to alter the traditional rule of at-will employment. It was in this context that we decided Wieder v Skala (80 NY2d 628 [1992]), the case upon which Horn pins her faith.
Plaintiff Wieder, an associate in a law firm, asked the firm to assign another associate to represent him in a real estate transaction. This associate neglected the project and then lied to Wieder in order to cover up his inattention. When Wieder asked the firm's partners to report the associate's misconduct to the Appellate Division's Disciplinary Committee, as required by DR 1-103 (a) of New York's Code of Professional Responsibility (22 NYCRR 1200.4), they balked. When the firm subsequently dismissed Wieder, he sued, claiming retaliatory discharge and breach of implied contract. Supreme Court dismissed his complaint on account of the employment-at-will doctrine (144 Misc 2d 346 [1989]) and the Appellate Division affirmed (167 AD2d 265 [1990]).
We rejected Wieder's argument that "the dictates of public policy in DR 1-103 (A) have such force as to warrant * * * recognition of the tort of abusive discharge" (80 NY2d at 638-639). Moreover, we relied upon Murphy and Sabetay for the proposition that major alterations in employment relationships are best left to the Legislature, pointing out the Legislature's enactment of the Whistleblower's Law (Labor Law § 740; Civil Service Law § 75-b). Although we reinstated the cause of action for breach of contract, we were careful to limit the reach of the exception to the at-will employment doctrine thus created and to preserve Murphy and Sabetay.
Critically, we observed that the plaintiffs in Murphy and Sabetay, employees working in the financial departments of large companies, provided professional accounting services in furtherance of their corporate responsibilities. By contrast, Wieder's provision of professional services to the firm's clients *94 as a member of the bar "was at the very core and, indeed, the only purpose of his association with [the law firm] * * * [His] duties and responsibilities as a lawyer and as an associate of the firm [are] so closely linked as to be incapable of separation" (id. at 635 [emphasis added]).
We also considered the particular ethical rule at issue in Wieder to be indispensable to the unique function of attorney self-regulation, a judgment that we are best situated to make since the regulation of lawyers in New York has been delegated by the Legislature to the Judiciary (see Judiciary Law § 90 [2]; see also People ex rel. Karlin v Culkin, 248 NY 465, 480 [1928] ["If the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work"]). Further, Wieder's failure to comply with DR 1-103 (a) put him at risk of suspension or disbarment.
We accordingly concluded that "these unique characteristics of the legal profession in respect to [DR 1-103 (a)] make the relationship of an associate to a law firm employer intrinsically different from that of the financial managers to the corporate employers in Murphy and Sabetay," which "call[ed] for a different rule regarding the implied obligation of good faith and fair dealing" (Wieder, 80 NY2d at 637). We were careful to point out, however, that we did not mean to "suggest that each provision of the Code of Professional Responsibility should be deemed incorporated as an implied-in-law term in every contractual relationship between or among lawyers" (id.).
Finally, and at the heart of our holding, we observed that Wieder and the law firm were engaged in a "common professional enterprise," the practice of law (id. at 638). Because of their common endeavor, Wieder and his firm were mutually bound to follow DR 1-103 (a). We specifically quoted the passage in Murphy (reprised in Sabetay) warning that in order for any condition to be implied in a contract, that condition must aid and further the agreement's underlying terms, and held that DR 1-103 (a) did so because "[u]nlike Murphy and Sabetay, giving effect to an implied understandingthat in their common endeavor of providing legal services [Wieder] and the firm would comply with the governing rules and standards and that the firm would not act in any way to impede or discourage [Wieder's] compliancewould be `in aid and furtherance of [the central purpose] of the agreement of the parties'" (id. [quoting Murphy, 58 NY2d at 304] [fourth alteration in original]).
*95 III.
We determined that the plaintiff in Wieder stated a cause of action for breach of an implied-in-law obligation in an at-will employment relationship because of the unique confluence of specific, related factors. Although Horn "strikes a sympathetic, and even a seductive, chord" (Horn v New York Times, 293 AD2d at 12 [Wallach, J., dissenting]), she has failed to plead facts that place her claim for breach of contract within the Wieder exception to the at-will employment rule.
First, Horn was employed as the Associate Medical Director of the Times' in-house Medical Department, where whatever medical care and treatment she rendered was provided only to fellow employees and only as directed by her employer. Moreover, while Horn alleges that, in fact, her "primary responsibilities" "were to provide medical care, treatment and advice to employees of the Times," the sole concrete example of these "primary responsibilities" offered in her complaint is the "determin[ation] if injuries suffered by Times employees were work-related, thus making the employees eligible for Worker's Compensation payments."
When Horn made assessments as to whether a Times employee had suffered a work-related illness or injury, she was surely calling upon her knowledge as a physician, but not just for the benefit of the employee. Rather, she was applying her professional expertise in furtherance of her responsibilities as a part of corporate management, much like Murphy and Sabetay and unlike Wieder. Concomitantly, to the extent that Horn, in fact, treated Times employees as part of her job responsibilities, her provision of these professional services did not occupy "the very core" or "the only purpose" of her employment with the Times, unlike Wieder's provision of legal services for his firm's clients.
Next, the commonly understood ethical standards that the Times allegedly directed Horn to violate at the risk of losing her professional license include CPLR 4504 (the physician-patient privilege, an evidentiary rule) and provisions in the Education Law and the Rules of the Board of Regents.[3] These provisions were not central to Horn's "conduct [of] her practice on [her] employer's behalf."
*96 We by no means intend to deny or belittle the importance of physician-patient confidentiality, which we just recently affirmed in Matter of Grand Jury Investigation in N.Y. County (98 NY2d 525 [2002]). Nonetheless, the principle of physician-patient confidentialityunlike DR 1-103 (a)is not a self-policing rule critical to professional self-regulation. More importantly, because of the absence of a common professional enterprise between Horn and the Times, the Education Law provisions cited by Horn do not impose a mutual obligation on the employer and the employee in this case.
Our dissenting colleague would compensate for the absence of a mutual obligation flowing from a common professional enterprise by substituting the notion that the Times knew or should have known about Horn's professional responsibility to protect patient confidentiality. By loosing Wieder from its analytical moorings, however, the dissent would create a broad new exception to the presumption of at-will employment, applicable to hosts of professional employees.
The only exceptions to the employment-at-will rule ever adopted by this Court have involved very specific substitutes for a written employment contract: in Weiner, the employer's express, unilateral promise on which the employee relied; in Wieder, the parties' mutual undertaking to practice law in compliance with DR 1-103 (a), a rule so fundamental and essential to the parties' shared professional enterprise that its implication as a term in their employment agreement aided and furthered the agreement's central purpose. We have consistently declined to create a common-law tort of wrongful or abusive discharge, or to recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into employment contracts, as the dissent would have us do, and we again decline to do so. The good and sufficient reasons underlying this forbearance, so eloquently expressed *97 by Judge Jones in Murphy, have not changed,[4] and Horn has presented us with no compelling reason in the facts of this case to expand the Wieder exception to the at-will employment rule.
Accordingly, the order of the Appellate Division should be reversed, with costs; defendant's motion to dismiss the first cause of action granted; and the certified question answered in the negative.
SMITH, J. (dissenting).
Because I believe that plaintiff Sheila Horn has stated a claim for breach of an implied contract between herself and defendant the New York Times, I dissent. I would affirm the order of the Appellate Division.
Plaintiff began her employment as a physician with the Times in 1995. In 1996, she became the full-time Associate Medical Director of the Times' Medical Department. Sometime in April 1999, however, Dr. Horn was terminated. In April 2000, she commenced an action, alleging breach of contract (first cause) and an entitlement to punitive damages (second cause). In May 2000, the Times filed a preanswer motion to dismiss the complaint for failure to state a cause of action. Supreme Court denied the motion as to the first cause, finding that Dr. Horn had stated a claim for breach of an implied contract of employment. Supreme Court reasoned that the strictures imposed upon those in the medical profession, and the resulting responsibility to the public, warranted extension of the principles set forth in Wieder v Skala (80 NY2d 628 [1992]). Supreme Court granted the motion as to the second cause which asserted only a claim for punitive damages. The Appellate Division affirmed, with two Justices dissenting (293 AD2d 1 [2002]). The Appellate Division certified to this Court the question of whether it had correctly affirmed Supreme Court.
"On a motion to dismiss pursuant to CPLR 3211, we must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 [2001] [citations omitted]). If the motion is denied, defendant has the right to submit an answer and address the merits.
*98 Dr. Horn's complaint alleged that her primary responsibilities were to provide "medical care, treatment and advice" to the company's employees and to examine employees seeking workers' compensation benefits to verify that their claims were work related. She further alleged that on "frequent occasions" various named departments of the company directed her to provide them with confidential medical records of employees "without those employees' consent or knowledge," and that the vice-president for human resources instructed her to "misinform employees regarding whether injuries or illnesses they were suffering were work-related so as to curtail the number of Workers' Compensation claims filed against the Times." After seeking advice from the New York State Department of Health, she was told "if a physician releases patient information and/or medical records without the consent of the patient, except under certain, narrowly-defined circumstances, that physician is violating several provisions of state law, the Code of Ethical Conduct of the American College of Occupational and Environmental Medicine, the Americans With Disabilities Act, and various federal regulations." Thereafter, she refused to comply with requests to turn over patients' medical records to other department heads without the patients' consent.
In April 1999, the human resources vice-president announced that the Times was restructuring the medical department and as a result the positions of Dr. Horn and Dr. DiPietro were eliminated. DiPietro had also failed to comply with requests from labor relations and other Times' departments for patient medical records without those patients' consent. Dr. Horn asserted that the Times thereafter contracted with Meridian Corporate Healthcare to provide a physician to work three days per week at the Times' main office, the place where she had worked. Dr. Horn asserted that she applied for the position but was not granted an interview. Human resources asserted economic reasons for the restructuring of the medical department. Dr. Horn alleged that she was terminated because she refused to comply with requests for confidential patient records and that her termination constituted a breach of the implied terms and conditions of the agreement between herself and the Times.
In hiring Dr. Horn, the Times impliedly committed to permitting her to perform her professional responsibilities in a manner not inconsistent with the ethical practice of medicine, and because Dr. Horn alleged in her complaint that the Times breached that agreement, she has stated a cognizable cause of action.
*99 In its decision, the Supreme Court stated:
"The conduct that plaintiff herein asserts resulted in her discharge is not merely `whistle blowing' type activity * * * but rather is affirmative conduct which defendant allegedly requested plaintiff to perform which could have an adverse [e]ffect on her patients and result in her losing her license to practice medicine, as well as the imposition of civil liability" (Horn v New York Times, 186 Misc 2d 469, 474 [2000]).
The Appellate Division stated:
"We cannot accept defendant's argument that nothing in the law prevents it from firing the associate director of its medical department for refusing to divulge confidential patient information. Instead, we hold that a physician may claim an exception to New York's employment-at-will doctrine based on an implied-in-law obligation of her employer to, at the very least, do nothing to prevent her from practicing medicine in compliance with the ethical standards of the medical profession" (Horn v New York Times, 293 AD2d 1, 3 [2002]).
Prior to the decision in Wieder v Skala, the long settled rule in New York was that "where an employment [was] for an indefinite term it [was] presumed to be a hiring at will which [might] be freely terminated by either party at any time for any reason or even for no reason" (Murphy v American Home Prods. Corp., 58 NY2d 293, 300 [1983] [citations omitted]). Accordingly, the Murphy Court declined to "judicially engraft[]" a good faith limitation on "the unfettered right of termination lying at the core of an employment at will" (id. at 305 n 2). Judge Meyer, on the other hand, noted in dissent that "[t]he at-will rule was created by the courts and can properly be changed by the courts but, more importantly, * * * the rule ha[d] for at least a century been subject to the `universal force' of the good faith rule. The Legislature, therefore, had no reason before the [Murphy] decision to believe that action on its part was required" (id. at 314).
In Wieder, however, this Court recognized that in certain contractual situations, an obligation of good faith and fair dealing arises which limits an employer's unfettered right to terminate at will. In Wieder, an associate who had been working for a law firm brought a claim alleging that the firm in *100 terminating him breached an implied term of his contract that the firm would do nothing to subvert the associate's ethical and lawful practice of law. The associate alleged that he had been wrongfully terminated because he insisted that the firm comply with DR 1-103 (a) of the Code of Professional Responsibility (22 NYCRR 1200.4), which requires an attorney to report the professional misconduct of another attorney.[1] In his complaint, the associate alleged that the firm had agreed to represent him in the purchase of a condominium apartment and had assigned a fellow associate to do everything that needed to be done. The fellow associate neglected the transaction for several months and made "false and fraudulent material misrepresentations" to conceal his neglect (80 NY2d at 632). When the associate learned of his fellow associate's neglect and false statements, he advised two senior partners. They conceded that they were aware of the fellow associate's having lied about pending legal matters on other occasions. The fellow associate admitted in writing that he had committed several acts of legal malpractice, fraud and deceit upon the associate and other clients. The associate alleged that the firm's partners refused to report the misconduct to the Appellate Division Disciplinary Committee as required under DR 1-103 (a). The associate met with the Committee, but later withdrew his complaint, he alleged, because the firm had indicated that he would be terminated if he reported the misconduct of his fellow associate. Plaintiff alleged he was berated, and, after completing important litigation, was terminated.
This Court, in seeking to determine if an obligation of good faith and fair dealing could be implied in the contract, observed:
"It is the law that in `every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.' The idea is simply that when A and B agree that B will do something it is understood that A will not prevent B from doing it. The concept is rooted in notions of common sense *101 and fairness * * *. [It is] a recognition that the parties occasionally have understandings or expectations that [are] so fundamental that they [do] not need to negotiate about those expectations" (id. at 637 [citations and internal quotation marks omitted]).
The Court also examined the nature of the relationship between the associate and the firm to see what could be implied in the contract. The Court observed that the relationship between the law firm and the lawyer hired as an associate was unique because (1) the associate was specifically hired to perform services for clients as a duly admitted member of the bar, but at the same time, the associate remained an independent officer of the court responsible to a broader public sense of professional obligations; (2) particularly critical to "survival of the [legal] profession" (id. at 636) was the obligation of self regulation imposed by DR 1-103 (a); and finally (3) because the associate and the firm were engaged in a common professional enterprise each was governed by the same general "rules of conduct and ethical standards * * * in carrying out the sole aim of their joint enterprise, the practice of their profession." (Id. at 638.) The Court recognized that "[i]ntrinsic to this relationship, of course, was the unstated but essential compact that in conducting the firm's legal practice both plaintiff and the firm would do so in compliance with the prevailing rules of conduct and ethical standards of the profession. Insisting that as an associate in their employ plaintiff must act unethically and in violation of one of the primary professional rules amounted to nothing less than a frustration of the only legitimate purpose of the employment relationship" (id. at 637-638).
As in Wieder, a similar promise by the Times, to permit Dr. Horn to perform her professional responsibilities in a manner not inconsistent with the ethical practice of medicine, should be implied in its relationship with plaintiff. Dr. Horn alleges that the Times hired her to perform core medical duties for clients. Specifically, she alleges that she was hired to provide "medical care, treatment and advice" to the company's employees and to examine employees seeking workers' compensation benefits to verify that their claims were work related. Such duties required her to use the medical skills she had acquired through training and practice as a physician. Dr. Horn makes no allegation that can reasonably be read to assert that she was hired to do anything but perform as a physician. The majority would distinguish Dr. Horn's duties at the Times as incorporating "corporate management" duties to be distinguished *102 from "the very core" or "only purpose" attorney duties of the associate in Wieder (majority op at 95). The associate in Wieder did not plead in his amended complaint that his attorney functions were his "sole functions"; rather, he pleaded that he "was associated with the law firm * * * and practiced solely in the area of commercial litigation."
As stated by the majority at the Appellate Division, "Any employer who hires a physician to provide medical care knows, or should know as a matter of common knowledge, that the physician is bound by the patient confidentiality provision of the ethical code of the medical profession" (293 AD2d at 8). Like the associate in Wieder, Dr. Horn remained a duly admitted member of a professional body and was bound by its rules. The American Medical Association Code of Medical Ethics both requires the confidentiality of information obtained by a physician in plaintiff's position and the reporting of physicians who violate that confidentiality.[2] In addition, section 6530 (23) of the Education Law defines as professional misconduct, the *103 "[r]evealing of personally identifiable facts, data, or information obtained in a professional capacity without the prior consent of the patient * * *." Section 6509 (9) of the Education Law defines professional misconduct to include "[c]ommitting unprofessional conduct, as defined by the board of regents." Section 29.1 (b) (8) of the Rules of the Board of Regents (8 NYCRR) defines professional misconduct to include the "revealing of personally identifiable facts, data or information obtained in a professional capacity * * *." The State of New York Department of Health has set forth a penalty of censure, reprimand, suspension of license, revocation of license, annulment of license, limitation on further license or fine for a person found guilty of professional misconduct (see Public Health Law § 230-a). The Department has suspended the license of a physician who evidenced moral unfitness by engaging in sexual relations with his patients, who revealed patient information without consent, who harassed and/or intimidated a patient and who failed to maintain accurate information (see Matter of Dieter H. Eppel, M.D., Determination and Order No. 02-82 of Professional Med Conduct Admin Review Bd; see also Matter of James Y. Severinsky, M.D., Determination and Order No. BPMC 00-226 of NY State Bd of Professional Med Conduct [suspending the license of a physician who revealed patient's personally identifiable information obtained in a professional capacity without patient's consent and committed professional misconduct by practicing fraudulently and advertising falsely]; Matter of James L. Duffy, M.D., Determination and Order No. BPMC 00-129 of NY State Bd of Professional Med Conduct [suspending the license of physician who engaged in sexual relations with a patient, revealed personally identifiable facts, data, or information about patient without consent, was grossly negligent, negligent and failed to maintain accurate records]).
The Department of Health, like the Departments of the Appellate Division, is responsible for maintaining standards and ethics of the profession and for enforcing those standards. In addition, the Principles of Medical Ethics of the American Medical Association states that physicians, including physicians employed by industry, have an ethical and legal duty to protect patient confidentiality and thus not to reveal confidential communications without the consent of the patient. The critical similarity between the rule governing Dr. Horn and the *104 rule governing the associate in Wieder is not that the rule needs to reflect the profession's self-governing functionthis is just a particular function of the legal profession. What is critical is that the profession regards the rule as intrinsic to its survival as a profession.
As to the third factor, the so called common enterprise factor, I agree with the Appellate Division that although Dr. Horn and the Times were not engaged in the same work, it is beyond cavil and universally known that a physician owes her patients a duty of confidentiality. Indeed, this Court observed in Matter of Grand Jury Investigation in N.Y. County (98 NY2d 525 [2002]) that the physician-patient privilege served three functions: (1) it "seeks to maximize unfettered patient communication with medical professionals, so that any potential embarrassment arising from public disclosure will not deter people from seeking medical help and securing adequate diagnosis and treatment"; (2) it "encourages medical professionals to be candid in recording confidential information in patient medical records * * *"; and (3) it "protects patients' reasonable privacy expectations against disclosure of sensitive personal information" (id. at 529 [citations and internal quotation marks omitted]). Just because the Times was "not a medical entity and therefore [was] not itself bound by the governing rules and standards of the medical profession [did] not negate the implied understanding in their relationship that the employer will not impede or discourage the physician's compliance with those particular rules and standards" (Horn v New York Times, 293 AD2d at 8, citing Wieder at 638).
This State's interest in protecting both the employer's and the employee's freedom of contract undergirds the employment-at-will doctrine. Nevertheless, even if the facts alleged in the complaint did not come within the Wieder rule, the strictures of the at-will doctrine itself, a judge-made doctrine, have been subject to a limited number of statutory exceptions (see Labor Law § 741 [2] [a] [preventing retaliatory discharge of health care employee making report of improper quality of patient care]; Labor Law § 740 [preventing retaliatory discharge against an employee who reports an employer's illegal activity creating a substantial and specific danger to public health and safety]; Civil Service Law § 75-b [preventing retaliatory discharge of public employee who reports violation of federal, state or local law]; see also National Labor Relations Act of 1935, 29 USC § 158 [defining unfair labor practices]; Civil Rights Act of 1964 tit VII, 42 USC § 2000e et seq. [stating that *105 it shall be an unlawful employment practice to discriminate against members of named suspect categories]).
It should be emphasized, however, that Dr. Horn's claim comes within the limited exception to the at-will doctrine carved out in Wieder, legal professionals (here medical professionals) performing public duties, not corporate duties, whose employers take adverse action against them because they insist upon complying with an identifiable statutory duty or ethical principle which is at the core of their profession. The contention of the majority that the dissent advocates a broad application of Wieder to all professionals is a misreading. Rather the dissent contends only that the rules and obligations which govern the conduct of doctors are similar to the rules applicable to lawyers. The most obvious of these rules is confidentiality.
No sound reason exists to preclude termination of a lawyer in Wieder while leaving without a remedy a doctor whose job it is to protect the physical and mental well-being of individuals. Even though the Times is not in the business of practicing medicine, "[i]t is significant * * * that The Times, a universally respected news organization, itself provides an essential service to the public that entails conforming to certain standards of truth, integrity and confidentiality of its news sources (see, e.g., Shield Law [Civil Rights Law § 79-h])" (Horn v New York Times, 293 AD2d at 11).
Accordingly, I would affirm.
Order reversed, etc.
NOTES
[1] Supreme Court dismissed the second cause of action on the ground that there is no separate cause of action for punitive damages. Horn did not appeal this aspect of the order.
[2] Murphy also alleged that he had been fired because he was over 50 years old.
[3] These provisions include Education Law § 6509 (9) (defining professional misconduct for those admitted to each of the 27 professions subject to licensure by the Department of Education to include "[c]ommitting unprofessional conduct, as defined by the board of regents"), coupled with section 29.1 (b) (8) of the Rules of the Board of Regents (defining professional misconduct for those admitted to each of the 27 professions subject to licensure by the Department of Education to include "revealing of personally identifiable facts, data or information obtained in a professional capacity without the prior consent of the patient or client, except as authorized or required by law" [8 NYCRR 29.1 (b) (8); see also 8 NYCRR 29.4 (a)]); and Education Law § 6530 (23) (specifying professional misconduct for the commission of which a physician licensee is subject to those penalties prescribed in section 230-a of the Public Health Law [e.g., censure and reprimand, suspension, limitation or revocation of license] to include the "[r]evealing of personally identifiable facts, data, or information obtained in a professional capacity without the prior consent of the patient, except as authorized or required by law"; cf. 8 NYCRR 29.1 [b] [8]).
[4] We note that the Legislature remains active in this area, just last year having enacted a new Whistleblower Law to protect certain health care workers (see Labor Law § 741).
[1] DR 1-103 (a) provided: "A lawyer possessing knowledge, (1) not protected as a confidence or secret, of a violation of DR 1-102 that raises a substantial question as to another lawyer's honesty, trustworthiness or fitness in other respects as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation."
[2] Rule E-5.09 of the Code of Medical Ethics states in part:

"Where a physician's services are limited to performing an isolated assessment of an individual's health or disability for an employer, business, or insurer, the information obtained by the physician as a result of such examinations is confidential and should not be communicated to a third party without the individual's prior written consent, unless required by law. If the individual authorized the release of medical information to an employer or a potential employer, the physician should release only that information which is reasonably relevant to the employer's decision regarding that individual's ability to perform the work required by the job.
"When a physician renders treatment to an employee with a work-related illness or injury, the release of medical information to the employer as to the treatment provided may be subject to the provisions of worker's compensation laws. The physician must comply with the requirements of such laws, if applicable. However, the physician may not otherwise discuss the employee's health condition with the employer without the employee's consent or, in the event of the employee's incapacity, the appropriate proxy's consent."
Rule E-9.031 of the Code of Medical Ethics states in part:
"Physicians have an ethical obligation to report impaired, incompetent, and unethical colleagues in accordance with the legal requirements in each state and assisted by the following guidelines: * * *
"Unethical conduct. With the exception of incompetence or impairment, unethical behavior should be reported in accordance with the following guidelines:
"Unethical conduct that threatens patient care or welfare should be reported to the appropriate authority for a particular clinical service. Unethical behavior which violates state licensing provisions should be reported to the state licensing board or impaired physician programs, when appropriate. Unethical conduct which violates criminal statutes must be reported to the appropriate law enforcement authorities. All other unethical conduct should be reported to the local or state medical society."